UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

E. MARK NOONAN,
        Plaintiff,


        v.                                    CIVIL ACTION NO.
                                              09-10723-MBB


WONDERLAND GREYHOUND PARK
REALTY LLC, WONDERLAND PARKING,
INC., ANGLO IRISH BANK
CORPORATION, PLC, WONDERLAND
GREYHOUND PARK, INC., THE WESTWOOD
GROUP, INC., STERLING SUFFOLK
RACECOURSE, LLC, COASTAL
DEVELOPMENT MASSACHUSETTS, LLC,
RICHARD P. DALTON and CHARLES
F. SARKIS,
        Defendants.


**MEMORANDUM AND ORDER RE:**
**CERTAIN DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**
**(DOCKET ENTRY # 35); PLAINTIFF'S MOTION FOR PARTIAL**
**SUMMARY JUDGMENT (DOCKET ENTRY # 25); MOTION OF ANGLO**
**IRISH BANK CORPORATION, PLC TO DISMISS (DOCKET ENTRY # 55);**
**COUNT XI DEFENDANTS' MOTION TO DISMISS COUNT XI OF THE**
**VERIFIED COMPLAINT AND FOR COSTS (DOCKET ENTRY # 63);**
**PLAINTIFF'S SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT**
**(DOCKET ENTRY # 96)**

July 8, 2010


**BOWLER, U.S.M.J.**

     Pending before this court are the following dispositive

motions:  (1) a motion to dismiss (Docket Entry # 55) filed by

defendant Anglo Irish Bank Corporation, PLC ("Anglo");[1] (2) a

_____

     [1]  At the request of this court, Anglo refiled the motion to
dismiss initially filed in Massachusetts Superior Court
Department (Suffolk County) prior to removal.  Anglo, an Irish
bank with a principal place of business in the Republic of

motion for partial summary judgment (Docket Entry # 25) filed by
plaintiff E. Mark Noonan ("Noonan"); (3) a cross motion for
summary judgment (Docket Entry # 35) filed by defendants
Wonderland Greyhound Park Realty LLC ("Realty"), Wonderland
Parking, Inc. ("Wonderland Parking"), Wonderland Greyhound Park,
Inc. ("Greyhound Park"), the Westwood Group, Inc. ("Westwood"),
Richard P. Dalton ("Dalton") and Charles F. Sarkis ("Sarkis")
(collectively "the Wonderland defendants"), Sterling Suffolk
Racecourse, LLC ("SSR") and Coastal Development Massachusetts,
LLC ("Coastal");[2] (4) a motion to dismiss Count XI and for costs
(Docket Entry # 63) filed by Greyhound Park, Dalton and Sarkis;
and (5) a second motion for partial summary judgment filed by
Noonan (Docket Entry # 96).  After conducting a hearing on the
first four motions, this court took those motions (Docket Entry
## 25, 35, 55 & 63) under advisement.  The second motion for
partial summary judgment (Docket Entry # 96) is based upon events
subsequent to the verified complaint and also ripe for review.

PROCEDURAL BACKGROUND

     The present real estate dispute arises out of amendments,
advances and changes made to various loan documents on the part

---

Ireland removed this action to federal court pursuant to 28
U.S.C. § 1441(d).

     [2]  In any context addressing this summary judgment motion, a
reference to the Wonderland defendants is intended to include SSR
and Coastal.

of Anglo, a first or senior mortgagee, and/or Realty, a borrower
and mortgagor of property located in Revere, Massachusetts.
Noonan holds a second mortgage and note on the property.  Among
Noonan's primary complaints are Realty's failure to pay the
amount due on the second mortgage and the second promissory note
on the September 12, 2007 maturity date; Anglo's $1,000,000
increase to the principal of the first mortgage and the first
promissory note in August 2006; Anglo's amendments to the terms
of the first mortgage and the first promissory note without
Noonan's consent at various times; and the issuance of property
purchase and note purchase options to Coastal and Sarkis in 2008
in contravention of Noonan's option to purchase loan documents.
Noonan maintains there were a number of events of default which
entitled him to bring this suit and purchase the loan documents.
Absent a continuing event of default under the first mortgage,
Noonan also asserts his entitlement to payment in full at
maturity on September 12, 2007.  To date, Noonan has not received
any payments.

The verified complaint sets out the following counts:  (1)
declaratory relief against all defendants (Count I); (2) breach
of contract against Realty for failure to pay the principal,
interest and associated charges on the maturity date of the
second mortgage or thereafter (Count II); (3) breach of contract,
in particular, covenants in paragraphs 16 and 17 of the second

3

mortgage, against Realty (Count III); (4) breach of contract, in particular, an intercreditor agreement, against Anglo (Count IV); (5) breach of the implied covenant of good faith and fair dealing in the second mortgage and the intercreditor agreement against Realty and Anglo (Count V); (6) appointment of a receiver and an order to marshal and preserve the assets of Realty, Wonderland Parking and Greyhound Park in order to pay Noonan (Count VI); (7) reach and apply against Wonderland Parking and Greyhound Park (Count VII); (8) reach and apply against Westwood (Count VIII); (9) reach and apply against Coastal and SSR (Count IX); (10) equitable subordination of advances Anglo made to Realty without Noonan's consent (Count X); (11) breach of fiduciary duty on the part of Greyhound Park, Dalton and Sarkis (Count XI); (12) impairment of Noonan's security interest by increasing the principal in the first promissory note and amending the loan to value ratio of the first mortgage against Realty and Anglo (Count XII); (13) intentional interference with the second mortgage and the second promissory note by Anglo (Count XIII); (14) intentional interference with the intercreditor agreement by Realty (Count XIV); (15) intentional interference with the second mortgage, the second promissory note and the intercreditor agreement by Westwood (Count XV); (16) violations of Massachusetts General Laws chapter 93A ("chapter 93A") against Realty, Westwood and Anglo (Count XVI); and (17) an accounting

4

against Realty, Wonderland Parking and Greyhound Park (Count XVII).

After the December 2008 filing of the verified complaint, certain events transpired that led to the exercise and transfer of the property purchase and loan purchase options in February 2010.  These subsequent events are the subject of the second summary judgment motion.

## FACTUAL BACKGROUND[3]

The only asset of Realty, a wholly owned subsidiary of Westwood, consists of approximately 34 acres of property in Revere ("the property").  Greyhound Park leases a portion of the property to operate a greyhound dog racing track.[4]  Wonderland

---

[3] The factual background sets out the facts relative to the summary judgment motions.  Unless otherwise noted, facts are construed in favor of the nonmovant in the discussion section and include the facts in the verified complaint.  See generally Sheinkopf v. Stone, 927 F.2d 1259, 1262-1263 (1st Cir. 1991) (if complaint is verified, it is appropriate to consider factual averments based on personal knowledge therein as equivalent of summary judgment affidavit).  The motion to dismiss is addressed using only the facts in the verified complaint, attached documents and other appropriate records.  See Alternative Energy v. St. Paul Fire and Marine, 267 F.3d 30, 33-34 (1st Cir. 2001); Blackstone Realty, LLC v. FDIC, 244 F.3d 193, 195 n.1 (1st Cir. 2001); Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993).  Citations to the record are provided primarily for direct quotations and do not necessarily denote all of the places in the record to support the quotation.

[4] Massachusetts abolished greyhound dog racing effective November 2009.  If Massachusetts enacts gambling legislation and awards a license(s) to Realty to operate a casino and/or slot machines on the property, there is little dispute that the value

Parking leases a different portion of the property upon which it operates a commuter parking lot.

In the middle of 2005, the Wonderland defendants sought financing to pay off existing mortgage loans and obtain funding for approximately two years of working capital. An internal Anglo document as well as an April 2005 appraisal commissioned by Dalton, President and Chief Executive Officer of Westwood, reflects the property's value in the range of $14,400,000 to $17,300,000 as of March 29, 2005. A July 2005 credit committee application to Anglo from Realty denotes the purpose as refinancing existing debt and funding "operating shortfalls pending the sale of the property."[5] (Docket Entry # 25, Ex. 2). An internal summary of the deal attached to the application demonstrates that Anglo agreed to refinance existing debt and cover operating shortfalls up to a 60% maximum loan to value ratio with Sarkis to cover other losses.[6]

─────────────────────

of the property would increase.

   [5] An attached summary of the deal similarly provides that, "Repayment will be from the sale of the land within the next two years." (Docket Entry # 25, Ex. 2). The summary of the proposal reflects that, "If gaming permission is not granted [Sarkis] will look to flip the track to a developer" (Docket Entry # 25, Ex. 2), an event that did not take place. The relevant loan documents dated September 12, 2005, do not refer to a purpose of selling the property. See fn. 75.

   [6] Again, the September 12, 2005 loan documents do not state that Sarkis agreed to fund any shortfall. As explained infra, Sarkis executed a guaranty agreeing to guarantee Anglo full payment and performance of Realty's liabilities to Anglo.

The summary characterizes the commuter parking lot as the "biggest revenue driver." (Docket Entry # 25, Ex. 2). From 2005 to November 2009 when Massachusetts abolished greyhound dog racing, the greyhound dog racing track suffered yearly operating losses. In contrast, the commuter parking lot averaged annual revenues of approximately $550,000 during the past several years.

A.  The Original Loan Documents

As a result of Realty's efforts, on September 12, 2005, Realty granted a first mortgage on the property to Anglo and its successors and assigns ("the first mortgage") to secure payment of an $8,820,000 loan evidenced by a promissory note ("the first loan" or "the first promissory note") between Realty, the borrower or mortgagor, and Anglo, the lender or mortgagee. Under an Advance/Holdback Letter ("the holdback agreement") dated September 12, 2005, with Realty, Anglo agreed to disburse an initial advance of $7,350,000 and, subject to Anglo's discretion and various terms, the remaining sum of $1,470,000 one year later. Sarkis executed a guaranty to Anglo individually guaranteeing Realty's prompt payment of the $8,820,000 loan ("the guaranty"). Under the guaranty, Sarkis agreed inter alia to pay the costs and expenses of Realty, including interest payments, taxes and insurance, in the event Realty did not make the payments. (Docket Entry # 25, Ex. 9, ¶ 1(b)).

Realty granted a Second Mortgage and Security and Fixture

Financing Statement ("the second mortgage") on the property to
Noonan.  The second mortgage secured payment of a $3,929,000 loan
evidenced by a second mortgage note ("the second loan" or the
"second promissory note") between Realty, again as borrower or
mortgagor, and Noonan, the payee or mortgagee.  Realty executed
the first mortgage and the first promissory note (collectively
"the senior loan documents") and the second mortgage and the
second promissory note (collectively "the subordinate loan
documents") on the same day, September 12, 2005.  Sarkis, a
previous client with a preexisting relationship with Anglo,
likewise executed the guaranty on September 12, 2005.  Also on
September 12, 2005, Anglo, as senior lender, Noonan, as
subordinate lender, and Realty, as borrower, entered into an
Intercreditor and Subordination Agreement ("the ICA")
subordinating Noonan's right of payment under the subordinate
loan documents to Anglo's right of payment under the senior loan
documents.[7]

1.  The ICA

The terms of the first and second mortgages and concomitant
promissory notes together with the terms of the ICA provide the
basis to examine the disputed transactions and amendments to the

---

[7]  Anglo executed the ICA on September 13 whereas Noonan and
Realty executed the document on September 12.  Above each
signature, the ICA clarifies that the parties "executed and
delivered" the agreement on September 12, 2005.

loan documents.  Turning first to the ICA, which is the only document executed by Realty, Anglo and Noonan, it begins with a recitation of certain facts.  First, the agreement describes the senior and subordinate loan documents including that "Senior Lender has agreed to make a first mortgage loan to Borrower in the principal sum of $8,820,000 ('Senior Loan')."  After this definition of the "Senior Loan" and additional descriptions of the subordinate loan documents, the ICA states that:

> Senior Lender is unwilling to make the Senior Loan to the Borrower or permit the Borrower to further encumber the Property with the Subordinate Mortgage unless the Subordinate Loan Documents are subordinated to the Senior Loan Documents.

(Docket Entry # 25, Ex. 10, ¶ D).  After these factual statements, the ICA sets out the representations and the agreements between the parties in 20 numbered paragraphs all prefaced by the language, "[T]he parties hereto represent, warrant and agree as follows."  (Docket Entry # 25, Ex. 10).

Under the ICA, Noonan agreed to subordinate the second mortgage, the second promissory note and other documents evidencing the $3,929,000 loan[8] to Anglo's right of payment under

---

[8] The ICA defines the second promissory note, the second mortgage and the related documents as the "Subordinate Loan Documents" and the amounts due thereunder as the "Subordinate Indebtedness."  The relevant language reads as follows:

> The Subordinate Note, the Subordinate Mortgage and all other documents evidencing and securing the Subordinate Loan are hereinafter referred to collectively as the "Subordinate Loan Documents."  All amounts due under the Subordinate Note

the first promissory note, the first mortgage, an assignment of
leases and rents and other documents evidencing the $8,820,000
loan.[9]  Noonan further agreed to subordinate the liens and
security interests created under the "Subordinate Loan Documents"
to the liens and security interests created under the "Senior
Loan Documents" including amendments and advances "made or
hereafter to be made" under the "Senior Loan Documents."  (Docket
Entry # 25, Ex. 10, ¶2).  The critically relevant language, which
appears in paragraph two, reads as follows:

> Subordinate Lender hereby agrees that (a) the Subordinate
> Indebtedness is and shall be subject and subordinate in the
> right of payment to the Senior Indebtedness and (b) the
> liens and security interests created by the Subordinate Loan
> Documents are and shall be in all respects subject and
> subordinate to the liens and security interests created by
> the Senior Loan Documents and to *any and all amendments,*
> *modifications, extensions, replacements or renewals* of the
> Senior Loan Documents, *and to any and all advances*

---

> and any other Subordinate Loan Documents are hereinafter
> referred to collectively as the "Subordinate Indebtedness.

(Docket Entry # 25, Ex. 10).

[9]   The ICA defines the first promissory note, the first
mortgage, the assignment of leases and the related documents as
the  Senior Loan Documents and the amounts due thereunder as the
Senior Indebtedness.  The relevant language reads as follows:

> The Senior Note, the Senior Mortgage, the Senior Assignment
> of Leases and all other documents evidencing and securing
> the Senior Loan are hereinafter referred to collectively as
> the "Senior Loan Documents."  All amounts due under the
> Senior Note and any other Senior Loan Documents are
> hereinafter referred to collectively as the "Senior
> Indebtedness."

(Docket Entry # 25, Ex. 10).

> *heretofore made or hereafter to be made under the Senior*
> *Loan Documents pursuant to the terms thereof*.  The foregoing
> shall apply, notwithstanding . . . the actual date and time
> of execution, delivery, recordation, filing or perfection of
> the Senior Mortgage or the Subordinate Mortgage, or the lien
> or priority of payment thereof . . ..

(Docket Entry # 25, Ex. 10, ¶ 2) (emphasis added).

Paragraph five of the ICA barred Noonan from amending the terms of the second mortgage and the second note without obtaining Anglo's consent.  It also prevented Noonan from transferring or assigning part of the second mortgage or the second promissory note without Anglo's consent.[10]  The ICA does not include a corresponding provision preventing Anglo from amending the terms or transferring part of the first mortgage or the first promissory note without Noonan's consent.[11]  Rather, under paragraph two, Noonan "agree[d]" to subordinate the liens and security interests of the second mortgage and the second promissory note to the "Senior Loan Documents," a definition that includes the first mortgage and promissory note, "*to any and all*

---

[10]   The relevant provision reads:

> Subordinate Lender shall not, without the prior written
> consent of Senior Lender, (a) transfer or assign all or part
> of the Indebtedness or any rights in respect thereof, . . .
> , or (c) amend or modify any of the terms or provisions of
> the Subordinate Loan Documents.

(Docket Entry # 25, Ex. 10, ¶ 5).

[11]   As noted infra, the second mortgage includes a provision regarding Realty's obligation to obtain Noonan's consent if Realty amends a prior mortgage.  (Docket Entry # 25, Ex. 8, ¶ 17).

*amendments . . .* of the Senior Loan Documents" and to "*any and all advances heretofore made or hereafter to be made under the Senior Loan Documents pursuant to the terms thereof.*" (Docket Entry # 25, Ex. 10, ¶ 2) (emphasis added).

Paragraph three of the ICA prevented or postponed Noonan from receiving payments under the second loan until payment in full of the "Senior Indebtedness." The paragraph further provided that if there was no "Event of Default" under any senior loan document, Noonan could receive "regularly scheduled payments" but not prepayments.[12] The relevant language reads as follows:

> Until such time as the Senior Indebtedness has been paid in full, the payment of all or any part of the Subordinate Indebtedness shall be postponed and subordinated to the payment in full of the Senior Indebtedness and Subordinate Lender shall not accept or receive, nor shall Borrower make, any payment on account of the Subordinate Loan except as expressly permitted by this Agreement. Notwithstanding the foregoing, so long as no Event of Default under any Senior Loan Document has occurred and is continuing, Subordinate Lender shall be permitted to receive regularly scheduled payments (but not prepayments) as provided in the Subordinate Loan Documents.

(Docket Entry # 25, Ex. 10, ¶ 3).

2. <u>Events of Default</u>

As indicated by the last clause of paragraph three, the ICA defines "Event of Default" in reference to the senior loan

---

[12] The parties dispute the meaning of the term "regularly scheduled payments." The ICA does not provide a definition.

12

documents.[13]  Turning to these documents, the first mortgage lists 17 events which constitute an "Event of Default" in section eight.  At the time of the first mortgage's execution, certain events of default under the senior loan documents required notice by Anglo[14] whereas others did not require notice.  With regard to the ones that did not require notice, Anglo and Realty executed a Second Amendment of Security Instruments on October 28, 2008, that defined these events of default as now requiring ten days notice.[15]  (Docket Entry # 25, Ex. 65, ¶ 11).

In seeking summary judgment, Noonan relies on a number of the designated events of default in the first mortgage that always required notice.  These include:  (1) the nonpayment of principal or interest "when it shall become due and payable" and such nonpayment shall have continued for more than ten (10) days

---

[13]  Throughout Noonan's filings, he contends that various events of default occurred which triggered his right to purchase the senior loan documents under section 13 of the ICA.  Noonan also argues that numerous defaults amount to material breaches of the ICA thereby excusing Noonan's further performance under the agreement and freeing him to pursue his remedies.  Finally, by ignoring the various defaults and refusing to declare a default, Anglo and Realty violated inter alia the implied covenant of good faith and fair dealing in the ICA and as to Realty the subordinate loan documents.  Alternatively, if there was no event of default, Noonan submits that the principal and interest due at maturity on the second loan was a "regularly scheduled payment[]" within the meaning of section three of the ICA.

[14]  The Wonderland defendants identify sections 8.1, 8.2, 8.3, 8.5 and 8.8.  (Docket Entry # 38, ¶ 87).

[15]  The new definition excluded cancellation or termination of insurance from the amendment.

after notice" from Anglo to Realty (Docket Entry # 25, Ex. 6, ¶ 8.1);[16] (2) absent a different notice specified elsewhere, the nonobservance of covenants for more than 30 days after notice from Anglo to Realty (Docket Entry # 25, Ex. 6, ¶ 8.3);[17] and (3) Realty's failure to maintain a loan to value ratio of not more than 60% which continues for more than 30 days after notice from

_____

[16]   Section 11.1 of the first mortgage mandates that all notices, demands and communications "shall be in writing" addressed to the applicable party at the designated address. (Docket Entry # 25, Ex. 6, ¶ 11.1).  The ICA contains a similar provision requiring notices, demands and communications to "be in writing" addressed to the applicable party at the stated address. (Docket Entry # 25, Ex. 10, ¶ 16).  The parties do not dispute that Anglo has not issued a notice of default.  (Docket Entry ## 27, 32 & 38, ¶¶ 164).

[17]   Section 8.3 states that, "Nonperformance or nonobservance of any of the other covenants, agreements, or conditions of this Mortgage [or] any of the other Security Instruments . . . such nonperformance or nonobservance shall have continued for more than thirty (30) days after notice thereof from Mortgagee to Mortgagor."  (Docket Entry # 25, Ex. 6, ¶ 8.3). Section five of the first mortgage lists the various covenants. Noonan cites to:  (1) the covenant requiring Realty to "pay all indebtedness hereby secured at the time or times and in the manner provided herein, in the Note, or in any other instrument secured hereby;" (2) the covenant requiring Realty to keep certain insurance in place and provide Anglo with evidence of such insurance; (3) the covenant requiring Realty to pay property taxes when due; (4) the covenant requiring Realty to keep proper financial statements and provide Anglo with certain financial information; and (5) the covenant requiring Realty to perform all covenants in any subordinate or junior mortgage, i.e., the second mortgage.  (Docket Entry # 25, Ex. 6, ¶¶ 5.2, 5.3, 5.4, 5.12 & 5.14) (Docket Entry # 27, ¶ 162).
     Anglo did not send Realty a notice "in writing" of nonperformance or nonobservance of any of the above covenants that complies with the notice requirements of section 11.1 of the first mortgage.

Anglo to Realty (Docket Entry # 25, Ex. 6, ¶ 8.16).[18]  Noonan
also relies on seven of the 17 designated default events (Docket
Entry # 26, ¶ B(3); Docket Entry # 27, ¶¶ 87-117) which did not
require notice prior to the aforementioned October 2008
amendment.

Section 8.4, the first of the seven provisions, is a catch
all provision defining an event of default under the first
mortgage as "any 'Event of Default'" under the first promissory
note "which would entitle Mortgagee [Anglo] to exercise any of
its remedies under any of the Security Instruments or any of the
Other Documents."  (Docket Entry # 25, Ex. 6, ¶ 8.4).  Section
8.6 prescribes "[t]he cancellation, lapse or termination of any
insurance coverage required to be maintained by [Realty]."[19]

---

[18]  Section 8.16 creates an event of default if Realty
"breach[es] the financial covenants set forth in Section 5.12.7"
and the breach "continue[s] for more than thirty (30) days after
notice thereof from Mortgagee to Mortgagor."  (Docket Entry # 25,
Ex. 6, ¶ 8.16).  Section 5.12.7, in turn, dictates that, "At all
times during the term of the Loan, Mortgagor shall maintain a
maximum Loan to Value Ratio of not more than sixty percent
(60%)."  (Docket Entry # 25, Ex. 6, ¶ 5.12.7).  The record fails
to contain a notice from Anglo to Realty regarding the non-
compliance with the loan to value ratio much less a notice that
complies with section 11.1 of the first mortgage.

[19]  Dalton attests that, "Realty maintained insurance
coverage for the Property at all times.  Specifically, there was
insurance on the Property between October 2005-March 2006."
(Docket Entry # 37, ¶ 14).  He also attaches a copy of the June
3, 2005 to April 1, 2006 policy to his affidavit.  The record
includes insurance binders for the April 1, 2007 to April 1, 2008
period (Docket Entry # 25, Ex. 30), the August 26 to October 26,
2005 period, the April 1, 2006 to April 1, 2007 period and the
April 1, 2008 to April 1, 2009 period (Docket Entry # 25, Ex.

Section 8.9 defines an event of default as a breach of representations or warranties.[20]

Section 8.10 defines an event of default under the first mortgage as encompassing any event of default under the second mortgage or the second promissory note. The relevant language of the section states that an event of default under the first mortgage includes "[t]he occurrence of any 'event of default' under any document, agreement or instrument . . . (b) evidencing any obligation or other indebtedness secured in whole or in part by any and all of the property covered by any of the Security Instruments." (Docket Entry # 25, Ex. 6, ¶¶ 1 & 8.10). Because

---

37). Hence, even viewing the record in Noonan's favor, no genuine issue of material fact exists regarding Realty's maintenance of insurance coverage on the property.

[20] Section 8.9 prescribes the "Breach of, or the proving false or misleading, in any material respect, of any representation or warranty now or hereafter made to Mortgagee by, on behalf of, or for the benefit of Mortgagor." Section four of the first mortgage addresses the representations and warranties which apply primarily to Realty. Section 4.6 of the first mortgage states that, "Neither Mortgagor, nor Guarantor, . . . is in default under any of their respective material obligations and agreements (including the payment of all federal, state and local taxes)." (Docket Entry # 25, Ex. 6). As Anglo and the Wonderland defendants correctly point out, however, this representation applies to the present as opposed to the future. It is a representation that neither Realty nor Sarkis "*is* in default" and that "no state of facts *exists*" that would constitute a default and that there is no legal action "now pending, or, to the knowledge of [Realty] or [Sarkis] threatened . . .." (Docket Entry # 25, Ex. 6, ¶ 4.6). Use of the present tense and the lack of a reference to a continuing obligation evidence the parties' intent that the provision applied to the present, i.e., September 12, 2005.

the property secured payment of the second loan evidenced by the second mortgage and the second promissory note, the foregoing language encompasses an event of default under the second mortgage and the second promissory note.

Section 21 of the second mortgage alphabetically lists seven events each constituting an "Event of Default" under the second mortgage.[21]  These include a failure to pay principal and interest "when due" under the second promissory note (Docket Entry # 25, Ex. 8, ¶ 21(a));[22] an untrue or unfulfilled warranty in the second promissory note or the second mortgage (Docket Entry # 25, Ex. 8, ¶ 21(c));[23] a failure to observe or perform

_____

[21]  Noonan cites Realty's failure to make payments upon the occurrence of the "Capital Event" of the additional $1,000,000 loan and the nonpayment of principal and interest at maturity of the second loan as constituting events of default under one or more of these subsections.  Noonan also identifies Realty's insolvency, Realty's noncompliance with covenants and the improper use of loan proceeds as events of default under section 21 of the second mortgage which, like the foregoing capital events, constitute events of default under section 8.10 of the first mortgage and, thus, events of default within the meaning of sections three and 13 of the ICA.  (Docket Entry ## 26, 48 & 49; Docket Entry # 27, ¶¶ 118-153).

[22]  The second promissory note mandates that all outstanding principal" and interest "shall be paid" to Noonan on September 12, 2007.  (Docket Entry # 25, Ex. 7, p. A1003637).  The second promissory note also categorizes as an "Event of Default" the failure to pay any amount of principal and interest "on any date on which [it] is payable" beyond any applicable notice and grace period.  (Docket Entry # 25, Ex. 7, p. A1003638).

[23]  The foregoing relevant provision prescribes "*any representation or warranty* made by Borrower [Realty] in the Note secured hereby [and] this Mortgage" that "be untrue when made or not be fulfilled."  (Docket Entry # 25, Ex. 8, ¶ 21(c)).  Citing

any covenant, agreement, term or provision in the second

promissory note (Docket Entry # 25, Ex. 8, ¶ 21(e))[24] or in the

_____

paragraph four in the second promissory note (Docket Entry # 25, Ex. 7, p. A1003637, ¶ 4), Noonan asserts that Realty warranted to negotiate exclusively with Noonan if it sells or markets the property and that a property purchase option is thus an event of default under section 21(c).  (Docket Entry # 27, ¶¶ 129-132). Noonan misreads paragraph four as a "representation or warranty" within the meaning of section 21(c) when it is actually an obligation that constitutes a "covenant, agreement, condition, term or provision" within the meaning of section 21(e).  See fn. 24.  Paragraph four states that:

> Notwithstanding anything to the contrary . . . , if at any time while this Note remains outstanding Borrower elects to sell or market for sale (or lease, as applicable) (i) all or any portion of the fee interest in the premises . . . ; (ii) any ground leasehold interest in all or a portion of the Property; or . . . , then Borrower shall be obligated to negotiate exclusively and in good faith with Lender for any such transaction.

(Docket Entry # 25, Ex. 7, ¶ 4) (emphasis added).  The paragraph does not refer to a "warranty" or a "representation."  It uses the mandatory language of "shall" and "obligated" and encompasses future events with the words "at any time."  The second promissory note does not define "obligated" but the term "obligation" ordinarily means a legal duty.  See Black's Law Dictionary (8th ed. 2004) (defining "obligation" as "[a] legal or moral duty to do or not do something"); see generally McDonnell Douglas Corp. v. U.S., 37 Fed.Cl. 295, 301 (Fed.Cl. 1997) ("obligation" defined in Black's Law Dictionary (6th ed. 1991) as meaning "'[t]o bind oneself by an obligation or promise . . . to execute a written promise or covenant'").  The second mortgage does not define the terms covenant, term or provision although such language is broad enough to include a legal duty to perform.
    This opinion does not foreclose Noonan's ability to address the property option agreement as an event of default under section 21(e) of the second mortgage and section 8.10 of the first mortgage.

    [24] As indicated in the previous footnote, section 21(e) prescribes the "failure to observe or perform any covenant, agreement, condition, term or provision . . . set forth or referred to in any of the Security Documents," a term that

second mortgage (Docket Entry # 25, Ex. 8, ¶ 21(g));[25] and an

event of default under the second promissory note (Docket Entry #

25, Ex. 8, ¶ 21(f)).[26]

---

includes the second promissory note.  (Docket Entry # 25, Ex. 8, ¶ 21(e)).  Like section 21(a), Noonan argues that Realty's failure to make capital event payments and its failure to pay principal and interest on or after the September 12, 2007 maturity date constitute events of default within the meaning of section 21(e).  Section 21(g) sets out a similar requirement for failure to observe or perform covenants and agreement in the second mortgage but, notably, it includes a notice and grace period provision.  Section 21(e) does not contain a notice or grace period provision.

[25]  Section 21(g) defines an event of default as a "failure to observe or perform any covenant, agreement, condition, term or provision of this Mortgage, and such failure shall continue without having been duly cured for a period of 10 days after written notice . . .."  (Docket Entry # 25, Ex. 8, ¶ 21(g)).

[26]  Section 21(f) defines an event of default under the second mortgage as "an Event of Default under any Security Agreement other than this Mortgage."  (Docket Entry # 25, Ex. 8, ¶ 21(f)).  Section 21(c) defines the term "Security Documents" to include the second promissory note.  (Docket Entry # 25, Ex. 8, ¶ 21(c)).  The second promissory note reads:

> It is expressly agreed that the occurrence of any one or more of the following shall constitute an "Event of Default" hereunder beyond any applicable notice or grace periods: (a) any failure to pay any amount or installment of interest or of principal and interest on any day on which the same is payable hereunder; (b) the Borrower's payout of any proceeds of the Borrower to the members thereof prior to the Maturity Date or repayment in full of this Note; (c) the use of all or any portion of the proceeds of this Note for any purpose other than as short-term working capital for the Borrower and/or Westwood . . . .

(Docket Entry # 25, Ex. 8, p. A1003638).  Realty did not pay Noonan the principal and interest on the September 12, 2007 maturity date.  As previously noted, however, section three of the ICA postponed payment until payment in full of the senior indebtedness.  Conversely, the section allowed Noonan to receive

19

Section 8.12(a) of the first mortgage classifies Realty's insolvency or inability to pay its debts as an event of default under the first mortgage.[27]  (Docket Entry # 25, Ex. 6, ¶ 8.12(a)).  Section 8.12(d), which also did not require a notice by Anglo, identifies the entry of a judgment or an attachment of Realty's property as an event of default if the event had a materially adverse impact on Realty's ability to perform its obligations under the senior loan documents.[28]  In pertinent

_____

"regularly scheduled payments," but not prepayments, absent an event of default under the senior loan documents.

[27]  Noonan submits that Realty was insolvent no later than September 12, 2007, as evidenced by the company's failure to pay the first loan when due.  (Docket Entry # 27, ¶¶ 106-108 & 145; Docket Entry # 26, ¶ B(2)).  Noonan additionally maintains that Realty was insolvent at the latest by the fall of 2007 thereby constituting an event of default under the first and second mortgages.  (Docket Entry # 27, ¶ 45; Docket Entry # 25, Ex. 6, ¶ 8.12; Docket Entry # 25, Ex. 8, ¶ 21(f)).

[28]  Noonan relies on a March 2007 preliminary injunction issued in Massachusetts Superior Court (Norfolk County) ("Massachusetts Superior Court") as constituting an event of default within the meaning of section 8.12(d).  The injunction arose in a case involving claims for unpaid legal bills brought by Jonathan L. Bashien, as assignee of Nixon Peabody, LLP, Bashien v. The Westwood Group, Inc. et al., Civil Action No. 07-00332 ("the Bashien case").  Noonan additionally points to the fall 2008 filing of municipal tax liens by the city of Revere and the commencement of foreclosure proceedings as events of default under section 8.12(d).  (Docket Entry # 27, ¶¶ 48 & 109-113).  In February 2008, the city of Revere commenced a foreclosure action against Realty.  By the fall of 2008, Realty was approximately $800,000 behind in the payment of its real estate taxes.  (Docket Entry # 27, 32 & 38, ¶¶ 47 & 149).  The summary judgment record presents a genuine issue of material fact regarding whether the foregoing events had "a material adverse impact on the ability of [Realty]" to perform its obligations.  See fn. 46.  Accordingly and given the lack of briefing on the

part, section 8.12(d) defines an event of default as, "The entry of any judgment against, or the attachment or garnishment of any of the property, goods or credits of, Mortgagor . . ., which remains unpaid, unstayed, undismissed or unbonded for a period of thirty (30) days if the same would have a material adverse impact on the ability of Mortgagor . . . to perform its obligations under any of the Loan Documents."  (Docket Entry # 25, Ex. 6, ¶ 8.12(d)).  Section 8.17, in turn, requires Realty to notify Anglo of any condition that constitutes a default within ten days of the occurrence of the condition.  (Docket Entry # 25, Ex. 6, ¶ 8.17).

    3.  Section 13 of ICA

    Returning to the provisions of the ICA, paragraph 13 also uses the term "Event of Default" under the senior loan documents. In particular, the section gives Noonan the right to purchase the senior loan documents "[u]pon the occurrence of an Event of Default under the Senior Loan Documents."[29]  (Docket Entry # 25, Ex. 10, ¶ 13).  The relevant language reads as follows:

---

issue, this court declines to make a ruling that the tax lien constituted an "attachment" within the meaning of section 8.12(d).

    [29] Noonan argues that various events constitute events of default under the first mortgage.  He also maintains that, by virtue of section 8.10 of the first mortgage, defaults under the second mortgage constitute events of default under the senior loan documents thereby triggering Noonan's right to purchase under section 13 of the ICA.  (Docket Entry # 26, ¶ B(3); Docket Entry # 27, ¶¶ 118-153).

> Upon the occurrence of an Event of Default under the Senior Loan Documents, and provided that Senior Lender has not foreclosed upon all or any portion of the Property, Subordinate Lender shall have the right, but not the obligation, to purchase the Senior Loan Documents for a purchase price equal to the sum of . . .."

(Docket Entry # 25, Ex. 10, ¶ 13).  Paragraph 13 did not contain a requirement for Anglo or Realty to notify Noonan of the existence of an event of default.

Paragraph 11, however, allowed Noonan to obtain the necessary information.  Paragraph 11, which appears two paragraphs above paragraph 13, reads as follows:

> Each party shall, within ten (10) days after request from the other party, provide periodic estoppel certificates . . . setting forth, without limitation, the current outstanding principal balance of the Senior Indebtedness or the Subordinate Indebtedness, as the case may be, whether there exist, to the best of their knowledge, any defaults under the Senior Loan Documents or the Subordinate Loan Documents, as the case may be, and such other matters as the requesting party may reasonably require.

(Docket Entry # 25, Ex. 10, ¶ 11).  Paragraph nine, which directs Anglo to give Noonan any notice of default it gave or received, states that:

> Senior Lender shall deliver to Subordinate Lender copies of any notice of default or other notice give[sic] or received by Senior Lender with respect to the Senior Indebtedness and Subordinate Lender shall have the right to cure any default under any of the Senior Loan Documents within the applicable cure periods set forth in such Senior Loan Documents.

(Docket Entry # 25, Ex. 10, ¶ 9).

4.  <u>Standstill and Remaining Provisions of ICA</u>

Paragraph two of the ICA, as previously noted, contains a

22

standstill provision.  Under this provision, Noonan "agree[d] not to contest, or to bring or join in any action or proceeding for the purpose of contesting, the validity, perfection or priority of, or seeking to avoid, any rights of Senior Lender in or with respect to the Senior Loan Documents or the Property."  (Docket Entry # 25, Ex. 10, ¶ 2).

Paragraph six of the ICA prevented Noonan from collecting or enforcing the second mortgage and the second promissory note without Anglo's prior written consent absent satisfaction of the senior indebtedness.[30]  The relevant language reads:

> Unless and until all Senior Indebtedness shall have been satisfied in full, Subordinate lender will not, without the prior written consent of Senior Lender (which consent may be withheld in the sole and absolute discretion of Senior Lender without regard to reasonableness), take any action:
>
> (a) to assert, collect or enforce all or any part of the obligations secured or evidenced by the Subordinate Mortgage or the Subordinate Loan Documents as against the Property or the Borrower or any other person or entity who or which may be liable to Senior Lender in respect of the Senior Loan Documents; or . . .
>
> (c) to obtain any other mortgage, attachment, judgment or other lien against the Property or any other property of the Borrower or any other person or entity who or which may be liable to Senior Lender in respect of the Senior Loan Documents.

(Docket Entry # 25, Ex. 10, ¶ 6).  In the event of such an action or proceeding, section 6(c) dictated the appointment of a

---

[30]  Noonan seeks to avoid these provisions by relying on the existence of a material breach by Anglo and/or Realty.  (Docket Entry # 26, ¶ II(B)).

receiver "by the court" to collect any "rents, issues and profits of the property." (Docket Entry # 25, Ex. 10, ¶ 6(c)). The ICA additionally provided for specific performance or injunctive relief if no adequate remedy at law existed for a breach of the agreement. (Docket Entry # 25, Ex. 10, ¶ 19).

Three final provisions of the ICA give Anglo additional protection. Section 6(b) barred Noonan from instituting an enforcement action or a foreclosure proceeding that would terminate third party leases. Section 15 provided that any act or failure to act on the part of Realty or any non-compliance on the part of Realty with any agreement shall not prejudice Anglo. It provides in pertinent part that:

> Senior Lender shall not be prejudiced in its rights under this Agreement by any act or failure to act of Borrower or Subordinate Lender, or any non-compliance of Borrower or Subordinate Lender with any agreement or obligation, regardless of any knowledge thereof which Senior Lender may have or with which Senior Lender may be charged; and no action of Senior Lender permitted hereunder shall in any way affect or impair the rights of Senior Lender and the obligations of Subordinate Lender under this Agreement.

(Docket Entry # 25, Ex. 10, ¶ 15).

Section 20 dictated that the provisions of the ICA would prevail over the provisions of the "Subordinate Mortgage Loan Documents," a term that included the second mortgage and the second promissory note. Section 20 states that, "In the event of any conflict between the provisions of this Agreement and the provisions of the Subordinate Mortgage or the Subordinate

Mortgage Loan Documents the provisions of this Agreement shall prevail." (Docket Entry # 25, Ex. 10, ¶ 20). The ICA did not contain an integration clause.[31]

5. <u>First Mortgage</u>

Turning to the other documents executed on September 12, 2005, the first mortgage gave Anglo the ability to extend the time and the terms of payment of the "Obligations." "Obligations" is a defined term in the first mortgage which means:

> (i) Payment of the indebtedness of Mortgagor to Mortgagee evidenced by the Note;
>
> (ii) payment by Mortgagor to Mortgagee of any and all sums expended or advanced by Mortgagee pursuant to any term or provision of this Mortgage; and
>
> (iii) performance and observances by Mortgagor of each and every covenant, condition and obligation contained in the Note, this Mortgage, the Loan Agreement . . ..

(Docket Entry # 25, Ex. 6, ¶ 3).

In addition to allowing Anglo to extend the time of payment, section 9.3 gave Anglo the ability to waive or modify these obligations.[32] The section reads, in part, as follows:

> Mortgagee, at any time and from time to time, either before or after maturity of the Note, irrespective of whether any

---

[31] In contrast, the first mortgage did include an integration clause. (Docket Entry # 25, Ex. 6, ¶ 11.9).

[32] Noonan correctly points out that the first mortgage required a writing signed by both Anglo and Realty to modify or terminate a provision of the first mortgage. (Docket Entry # 25, Ex. 6, ¶ 11.3); <u>see also</u> fn. 16.

Default Condition then exists and without notice or consent, may do any one or more of the following: . . .

(b) make any agreement extending the time,[33] or otherwise altering the terms of payment of the Obligations or any part thereof, or modifying or waiving any of the Obligations, or subordinating, modifying or otherwise dealing with the lien or liens securing payment of the Obligations;

(c) exercise or refrain from exercing or *waive* any right Mortgagee may have;[34]

(d) accept additional security of any kind . . ..

(Docket Entry # 25, Ex. 6, ¶ 9.3).  Section 9.3 thus gave Anglo the ability to waive or modify the obligations, a term that includes not only the terms of payment but also performance of "every covenant, condition or obligation" in the promissory note and the first mortgage.  (Docket Entry # 25, Ex. 6, ¶¶ 3 & 9.3(b)).

The first mortgage defined "the Note" as "[t]he [first] Promissory Note of Mortgagor of even date herewith in the principal amount of EIGHT MILLION EIGHT HUNDRED TWENTY THOUSAND DOLLARS (US $8,820,000) payable to the order of the Mortgagor and any and all extensions, renewals and modifications thereof and substitutions therefor, whether of the same amount or otherwise."

---

[33]  This subsection of the first mortgage together with Anglo's express ability in the ICA to amend the first mortgage (Docket Entry # 25, Ex. 10, ¶ 2(b) combine to unequivocally give Anglo the authority to extend the maturity date of the first loan.

[34]  Section 9.2 sets out the "Rights upon Default" whereas section 8 lists the "Events of Default," a number of which do not require Anglo to provide notice.

26

(Docket Entry # 25, Ex. 6, ¶ 1).  It also required Realty to

maintain a maximum loan to value ratio of no more than 60% at all

times.  (Docket Entry # 25, Ex. 6, ¶ 5.12.7).  As also stated in

the first mortgage, Anglo and Realty did not intend the first

mortgage or the first promissory note to create any third party

beneficiary rights in Noonan.[35]

     6.  <u>Remaining Terms of Promissory Notes and Second Mortgage</u>

     The terms of the first promissory note set September 12,

2007, as the maturity date for the "entire Principal Sum," a term

defined in the first paragraph as the sum of $8,820,000.  (Docket

Entry # 25, Ex. 5).  The terms of the second promissory note

between Realty and Noonan set the same maturity date.

     With respect to the terms of the second promissory note, it

contained a "Capital Event" covenant.  A "Capital Event" within

the meaning of the second promissory note included:

> any equity financing, debt financing or combination thereof
> by either [Realty] or Westwood which generates in excess of
> EIGHT MILLION EIGHT HUNDRED AND TWENTY THOUSAND and
> 00/100ths DOLLARS ($8,820,000.00).  The amount of any such
> Mandatory Prepayment shall equal the aggregate amount of
> capital generated by a Capital Event . . . and shall be
> payable to [Noonan] concurrently with the closing of the

---

[35]  The relevant provision reads:

11.6 The Mortgagor and Mortgagee do not intend the benefits
of any one or more of the Loan Documents to inure to, or
otherwise exist for, the benefit of any third party who has
a contractual relationship with Mortgagor, who is a creditor
of Mortgagor with respect to the Mortgaged Property . . .."

(Docket entry # 25, Ex. 6, ¶ 11.6).

relative Capital Event.

(Docket Entry # 25, Ex. 7).  The self executing covenant did not require Noonan to provide notice or a written demand upon Realty.[36]

Turning to the terms of the second mortgage, it included a provision prohibiting Realty from amending, modifying or extending any prior or senior mortgage without Noonan's prior consent.[37]  The language states that, "[I]f this Mortgage is at any time subject or subordinate to another mortgage, the Mortgagor shall not modify, amend, or extend such prior mortgage . . . without the consent of the Mortgagee."  (Docket Entry # 25, Ex. 8, ¶ 17).  The second mortgage included an acknowledgment and agreement on the part of Noonan that his rights under the second mortgage "are subject to the rights of" the mortgagee under the first mortgage.  (Docket Entry # 25, Ex. 8).

The second mortgage also prohibited Realty from allowing an encumbrance to attach to the property.  (Docket Entry # 25, Ex. 8, ¶ 16(a)).  If such an encumbrance attached, section 16(a) required Realty to discharge it within 30 days of the attachment. The second mortgage also made the entire debt due and payable on

---

[36]  Noonan argues that the $1,000,000 increase to the amount of the first loan in August 2006 constituted a capital event.

[37]  Noonan submits that the August 2006 and August and October 2008 amendments and agreements made without his consent violated this provision.

demand in the event any portion of a legal or beneficial interest "becomes vested in" anyone other than Realty. (Docket Entry # 25, Ex. 8, ¶ 15).

Finally, the second mortgage required Realty to promptly notify Noonan of the existence of any existing or future security interest known by Realty. Under this section, Realty agreed "to notify the Mortgagee promptly of the existence of and the exact details of any other security interest in the Premises, now existing or hereafter arising . . .." (Docket Entry # 25, Ex. 8, ¶ 13).

B.   The August 2006 Loan

In July 2006, one year after the first credit committee application to Anglo, Realty submitted another application for additional funding in the amount of $1,000,000. As reflected in a memorandum attached to the application, the original "$8.2 million is fully drawn." (Docket Entry # 25, Ex. 17). At the time, Realty was negotiating with eight candidates as potential partners to develop the property and repay Anglo. Anglo's credit committee described the loan as funding "operating shortfalls pending the sale of the property." (Docket Entry # 25, Ex. 17).

On August 2, 2006, Anglo and Realty executed a Note Modification Agreement and Amendment of Loan Documents. The amendment amended the first promissory note and increased the

principal amount by the additional $1,000,000.[38]  Under the
agreement, Realty warranted there was an absence of litigation
that "would have a material effect" on Realty's business.
(Docket Entry # 25, Ex. 19, ¶ 5.3).  It also warranted that,
"There exists no Event of Default under any of the Loan
Documents."  (Docket Entry # 25, Ex. 19, ¶ 5.5).

In an agreement also dated August 2, 2006, Realty and Anglo
agreed to amend the definition of "Note" in the first mortgage to
increase the $8,820,000 principal amount to $9,820,000.
Captioned as Amendment of Security Instruments ("amendment of
security instruments"),[39] the agreement otherwise ratified and
confirmed the terms of the first mortgage.  The 60% loan to value
ratio provision therefore remained intact.  The July 18, 2006
application to the credit committee, however, reveals an
increased loan to value ratio of 67%.[40]  The September 12, 2007
maturity date remained unchanged.

---

[38]  As previously intimated, Noonan submits that the advance
and concomitant amendment by Realty and Anglo to the first
mortgage and the first promissory note violates the capital event
provision of the second promissory note and sections 17 and 21(e)
of the second mortgage.

[39]  The amendment of security instruments and the Note
Modification Agreement and Amendment of Loan Documents are
collectively referred to as "the August 2006 amendments."

[40]  Anglo did not obtain an updated appraisal for the loan.
Billy McCardle ("McCardle"), an Anglo vice president, discounts
the 67% ratio as "not based on an MAI Appraisal" but simply a
conservative figure "based on the low end of the [July 2005]
appraised figures."  (Docket Entry # 33, ¶ 6).

Anglo and Realty did not procure Noonan's written consent
for the amendment prior to executing the aforementioned
documents.  Noonan attests that he did not consent to the 2006
amendment.  He likewise avers that "none of the defendants"
informed him of the amendment before its execution or "promptly
thereafter."  (Docket Entry # 25, Ex. B).  Indeed in a July 2006
email, Anglo's outside counsel posited it may be necessary "to
get a further subordination or consent from the second mortgagee
to assure the priority of the additional advances under the first
mortgage loan" but "[p]erhaps we can handle this simply by having
the title company insure the priority of the additional
advances."[41]  (Docket Entry # 25, Ex. 18).  In a September 8, 2006
document to generate interest in the property, Noonan refers to
"a first mortgage on the property of approximately $10.0
million."  (Docket Entry # 18, Affidavit of Richard P. Dalton,
Ex. B).

Realty used the loan to pay real estate taxes in excess of
$400,000, interest payments to Anglo and operating shortfalls.
Notwithstanding the nonpayment of taxes and interest payments,
Anglo did not notice or declare a default.[42]

---

[41]  The final August 2006 amendment required, among other
items, an endorsement to the title insurance policy increasing
the amount of coverage to $9,820,000.  (Docket Entry # 25, Ex.
19, ¶ 6.6).

[42]  Periodically, Anglo sent Realty statements with the
account's breakdown of past due arrears and a request for

31

C.   Events Leading to August 2008 Amendment

In February 2007, Jonathan L. Bashien, as assignee of Nixon Peabody, LLP, filed the complaint in Massachusetts Superior Court that initiated the Bashien case against various entities including Westwood, Realty and Wonderland Parking.[43]  Bashien did not file suit against the other defendants.  The complaint led to issuance of the March 2007 preliminary injunction.  Neither Realty nor Anglo informed Noonan about the injunction and the case settled in June 2009.

Realty's debt to Anglo continued to increase.  As of February 1, 2007, Realty owed Anglo interest payments dating as far back as June 2006.[44]  Again, Anglo did not declare a default.  By letter dated February 1, 2007, McCardle asked Sarkis to pay the outstanding interest arrears which totaled $407,158.32.[45] (Docket Entry # 25, Ex. 25).

On June 29, 2007, the Office of the Treasurer of the City of Revere ("Treasurer's Office") issued notices of taking to Realty for 2007 taxes not paid on the property within the statutory 14

_____

payment.

[43]   See fn. 28.

[44]   An August 28, 2006 letter identified nonpayment of the same June 2006 invoice amount.

[45]   Noonan inaptly cites this document as a notice of default to Realty on the second mortgage.  (Docket Entry # 27, ¶ 71).

day period after demand.  The notices lead to the Treasurer's
Office issuing instruments of taking on the property on August 6,
2007.  See Mass. Gen. L. ch. 60, ¶¶ 43, 53 & 54; (Docket Entry #
25, Ex. 31); (Docket Entry ## 27, 32 & 38, ¶¶ 48); (Docket Entry
# 25, Ex. 38, "the land . . . was taken on 8/6/07 for non-payment
of taxes").  The city recorded the tax takings on September 19
and October 1, 2007.  Dalton attests that these tax takings did
not have an adverse effect on Realty's ability to perform under
the first mortgage.[46]  (Docket Entry # 37, ¶ 15).

---

[46]  Dalton's affidavit (Docket Entry # 37) balanced against
the amounts of the tax takings (Docket Entry # 25, Ex. 31)
creates a genuine issue of material fact as to whether the tax
takings had "a material adverse impact on the ability of [Realty]
. . . . to perform its obligations under any of the Loan
Documents" within the meaning of section 8.12(d) of the first
mortgage.  Section 8.12(d) also requires a judgment, attachment
or garnishment.
    In a related vein, in the second mortgage Realty
"covenant[ed] and agree[d]" to pay all taxes ten days before due.
(Docket Entry # 25, Ex. 8, p. A1003643 & ¶ 2).  Section 21(g)
identifies as an event of default under the second mortgage a
failure to observe or perform "any covenant [or] agreement" in
the second mortgage for a ten day period "after written notice
thereof given by the Mortgagee [Noonan] to the Mortgagor
[Realty]."  (Docket Entry # 25, Ex. 8, ¶ 21(g)).  Noonan issued a
written notice to Realty regarding the nonpayment as a default on
April 8, 2009.  (Docket Entry # 25, Ex. 77).  Under the present
summary judgment record, therefore, the nonpayment of real estate
taxes did not ripen into an event of default under section 21(g)
of the second mortgage until April 2009.  By that time, Noonan's
exercise or attempt to exercise his right to purchase the senior
loan documents had already taken place.  Also by that time, Anglo
and Realty had amended the first mortgage to include a notice
provision for a default under section 8.10 of the first mortgage.
    Taxes not paid when due under section 5.4.1 of the first
mortgage may also give rise to genuine issues of material fact
that Realty breached this obligation.  It is undisputed, however,
that Anglo did not issue a notice of the nonperformance of the

McCardle attests that in August 2007 Anglo and Realty "reached an agreement in principle to . . . extend the loan to August 2008 and to increase the principal amount of the loan to $12,000,000." (Docket Entry # 33, ¶ 7). McCardle also points to an April 2008 email to Dalton explaining a $27,500 fee as "due for the extension from last year." (Docket Entry # 33, Ex. 2). Notably in light of the requirements of section 11.1, the parties did not enter into a written agreement until August 2008.

Anglo did not declare a default or send Realty a notice of default on the September 12, 2007 maturity date. Anglo did not receive payment of the principal on the September 12, 2007 maturity date.[47] Noonan did not receive payment of the principal and/or interest on the September 12, 2007 maturity date.

The second promissory note dictates the application of an increased rate of 15% interest on the amounts due after maturity. A 12% rate is applied prior to maturity. The relevant provision for the 12% rate states that it accrues until the maturity date. Realty promised to pay Noonan the $3,929,000 principal:

> with interest thereon as provided herein, . . ., together with interest on the unpaid principal balance thereof from time to time at a fixed rate per annum (the "Stated Rate") of twelve percent (12%). Such interest shall be compounded quarterly and shall accrue until and be payable on the

covenant to Realty which section 8.3 requires. See fn. 17.

[47] Anglo received some but not all interest payments prior to September 2007. (Docket Entry # 25, Ex. 25; noting September 2006 payment).

34

Maturity Date.
(Docket Entry # 25, Ex. 7).  Elsewhere in a separate paragraph,
the second promissory note unequivocally reads that, "The
Borrower agrees that . . . all amounts due under this Note after
maturity, and any amounts due hereunder if an Event of Default
shall occur hereunder, shall bear interest at a rate of fifteen
percent (15%)."  (Docket Entry # 25, Ex. 7).

In the fall of 2007, Realty and Anglo discussed and/or
planned to procure the $12,000,000 increase to the principal
while Sarkis and Dalton attempted to obtain Noonan's consent to
the increase.  Indeed, an August 29, 2007 email from Anglo's
attorney indicated the need for Noonan "to consent and
subordinate" the second mortgage to the increase.  (Docket Entry
# 25, Ex. 32A).  McCardle attests that Anglo sought Noonan's
consent because the title insurance company refused to insure the
priority of the increase absent Noonan's consent.  (Docket Entry
# 33, ¶ 7).  Noonan advised McCardle that he was hopeful they
"might work something out" although they did not reach any
agreement at that time.  (Docket Entry # 52, ¶ 7).  Anglo and/or
Realty prepared an amended and restated ICA with the $12,000,000
figure for Noonan's signature.  As of the end of 2007, however,
Anglo and Realty were still waiting to find out if Noonan would
consent to the increase.

Meanwhile, in October 2007, an independent auditor of the

35

2006 consolidated balance sheets of Greyhound Park and its wholly
owned subsidiary, Realty, expressed "substantial doubt regarding
the Company's ability to continue as a going concern." (Docket
Entry # 25, Ex. 34). An independent auditor of the 2007
consolidated balance sheets of Greyhound Park and Realty
similarly notes that:

> [O]ver the past years, the Company has experienced several
> years of significant operating losses and has an accumulated
> deficit of approximately $19.7 million as of December 31,
> 2007. Additionally, the Commonwealth of Massachusetts
> passed legislation subsequent to year-end abolishing dog
> track racing effective January 1, 2010. These matters
> raised substantial doubt regarding the Company's ability to
> continue as a going concern.

(Docket Entry # 25, Ex. 68).[48]

Anglo and Realty did not amend the senior loan documents to
increase the principal to $12,000,000 (Docket Entry ## 27, 32 &

_____

[48] The 2007 consolidated balance sheets attached to the
auditor's report reflect the following:

> Second Mortgage Note, due on demand, issued to private
> investor bearing interest at 12%. Interest, compounded
> quarterly, shall accrue and be payable on September 12,
> 2007, the maturity date. This note has not been extended as
> of the date of these financial statements, and the Company
> started accruing interest at the default rate of 15%
> subsequent to its maturity. The balance includes compounded
> interest in the amount of $1,274,690. This note is
> subordinated to the First Mortgage Note via an intercreditor
> and subordination agreement.

(Docket Entry # 25, Ex. 68, p. A1010722). Dalton attests that
the accrual of 15% interest on Realty's financial books was not
intended as "an acknowledgment of any default." (Docket Entry #
37, ¶ 7). McCardle avers that, "Anglo did not attempt to analyze
Realty's solvency in 2007." (Docket Entry # 33, ¶ 11).

38, ¶¶ 43) and did not obtain Noonan's consent for the increase. Noonan did not consent due to his concern that the property's value was not large enough to ensure repayment of the second promissory note.

In the spring and summer of 2008, Realty was negotiating various transactions, including a payoff of the first loan, with a number of entities.  In April 2008, McCardle urged Sarkis and Dalton to pay the approximate $333,000 in interest arrears.  In May 2008, one of Realty's creditors issued a notice of default under a power purchase agreement it had with Realty due to Realty's outstanding arrears of $78,251.96.  Having made two payments in May, Realty owed outstanding interest of $131,234.18 as of June 2, 2008.  As of August 5, 2008, Realty owed Anglo $375,385.63 in overdue interest under the first promissory note. (Docket Entry # 25, Ex. 41 & 44; Docket Entry # 37, Ex. G).

D.   August 2008 Amendments and Option

On August 12, 2008, Westwood (including its wholly owned subsidiaries Realty, Greyhound Park and Wonderland Parking) and Coastal entered into an option agreement issuing to Coastal an option to purchase the property until December 1, 2009 ("the property option agreement").[49]  Westwood, Realty and Coastal

---

[49]   In an email a year earlier, Noonan posited a number of options for the property including selling racing options.  In the course of discussing business options for the property in April 2007, Noonan also noted the possibility of an option agreement.  (Docket Entry # 37, Ex. B & D).

executed the agreement as did Sarkis who agreed to personally
guaranty Westwood's obligations to Coastal under the agreement.
(Docket Entry # 25, Ex. 46).   Noonan learned about the agreement
"after the fact" by reading the Boston Globe.   (Docket Entry #
52, ¶ 8; Docket Entry # 25, Ex. B, ¶ 17).   Dalton attests that
Westwood excluded him from the negotiations leading to the
property option agreement because "Noonan's self-interest got in
the way."   (Docket Entry # 18; Docket Entry # 37, ¶ 10).

The property option agreement provides for Coastal to
deposit $900,000 into an escrow account pending receipt inter
alia of satisfactory evidence that Westwood obtained an extension
of the first loan to December 1, 2009, which gave Coastal "a
right (but not the obligation)" to purchase the first mortgage
loan in the event Anglo desired to sell it.   (Docket Entry # 25,
Ex. 46, ¶ 3(A)).   Of the $900,000 escrow fund, Coastal agreed to
release $350,000 to Westwood upon receipt of the extension and
proof of Sarkis' net worth; to release $400,000 upon receipt of
evidence of a payment plan with the city of Revere for
outstanding taxes; and to release $150,000 upon execution of the
agreement.[50]   (Docket Entry # 25, Ex. 46, ¶ 3(A)).   In addition to
the $900,000 payment, Coastal agreed to pay a monthly fee of
$300,000 to Westwood up to an aggregate amount of $4,000,000.

---

[50]   Noonan correctly points out that the funds went to
Westwood as opposed to its wholly owned subsidiary Realty.

The agreement gave Coastal the option to purchase the property and/or a gaming license for a fee of $25,000,000 as well as certain annual and initial fees dependent upon enabling gaming legislation.  The agreement also dictated fees payable by Coastal to Westwood as opposed to Realty.  The agreement further sets out a "triggering event" that "automatically triggered" the option.  The automatically triggered event was the existence of enabling gaming legislation during the term of the option.  If triggered automatically or by Coastal, the option gives Coastal development rights and the right to acquire the property. (Docket Entry # 25, Ex. 46, ¶¶ 5 & 6).

As also set out in the agreement, Westwood agreed to credit certain payments towards the $25,000,000 purchase price in the event Coastal exercised the option or upon automatic triggering of the option.  Thus, the payments reduced the eventual purchase price while providing needed capital for outstanding taxes and working capital.[51]  Westwood also agreed to indemnify Coastal for any loss or expenses incurred in connection with any claim by Noonan with respect to his interest in the property.  (Docket Entry # 25, Ex. 46, ¶ 10).

On August 13, 2008, Coastal assigned the agreement to SSR Acquisitions LLC ("SSRA"), an entity the parties also refer to as

---

[51] Even considering that the payments went to Westwood as opposed to Realty, it is a genuine issue of material fact as to whether the property option agreement impaired Noonan's security.

Suffolk Downs.  (Docket Entry # 27, ¶ 64; Docket Entry # 32, ¶ 64; Docket Entry # 38, ¶ 64).  For a fee, the property option agreement allows SSRA to extend the option by up to three additional 12 month time periods.  (Docket Entry # 25, Ex. 46, ¶ 5(C)).  Dalton explains that Westwood reached the agreement with SSRA instead of competing against "Suffolk Downs' owners" for an expected limited number of expanded gaming licenses.

On August 14, 2008, Anglo and Realty entered into a document dated August 31, 2007, amending the maturity date of the first loan to August 31, 2008 ("the August 2008 amendment").[52]  The August 2008 amendment extended the maturity date of the first loan to August 31, 2008.

On August 20, 2008, Noonan requested information concerning the outstanding loan balance.[53]  An appraisal of the property as of August 27, 2008, placed its market value at $17,300,000.  As of September 1, 2008, Realty owed Anglo in excess of $375,000 in interest on the first loan.  By the fall of 2008, Reality was approximately two years and $800,000 behind in the payment of real estate taxes on the property to the city of Revere.  In the fall of 2008 and in light of the municipal tax liens, the city of

---

[52]  The Wonderland defendants and Anglo maintain that Noonan already agreed to the extension by virtue of paragraph 2(b) of the ICA.  Noonan characterizes the document as "backdated" to August 31, 2007.

[53]  As previously explained, section 11 of the ICA allows either party to obtain such information.

Revere commenced a foreclosure action and filed another lawsuit seeking recovery of unpaid taxes.  The liens were released on November 24, 2008.  (Docket Entry ## 27, 32 & 38, ¶¶ 47 & 48).

In September 2008, Noonan wrote a series of three letters to Anglo, Sarkis and/or Realty objecting to the August 2006 amendment increasing the senior loan to $9,920,000 without his consent as well as the August 2008 amendment executed without his consent.  In the September 5 and 16, 2008 letters to Sarkis and Realty, Noonan identified the $1,000,000 increase as a capital event under the second promissory note as well as a default.  He also pointed to the failure to pay the second promissory note in full on the September 12, 2007 maturity date as a default. (Docket Entry # 25, Ex. 49, 51 & 52).

In the September 2, 2008 letter Noonan also advised Anglo of his right to purchase the senior loan documents and requested a complete copy of the documents as well as an estoppel certificate pursuant to section 11 of the ICA.[54]  (Docket Entry # 25, Ex. 49).

--------

[54]  Noonan opines that he "sought to exercise [his] right to purchase the First Loan . . .."  (Docket Entry # 25, Ex. B, ¶ 20).  The September 2, 2008 letter requests an estoppel certificate and concludes with the statement that, "I will contact you to discuss exercising my right to make the purchase." (Docket Entry # 25, Ex. 49).  Even viewing the record in Noonan's favor, the September 2, 2008 letter is not a request to purchase the senior loan documents under section 13.  Section 13 gave Noonan the right to purchase the senior loan documents "for a price equal to the sum of all amounts owed by [Realty] under the Senior Loan Documents . . . as such amount is determined by [Anglo] in its discretion."  (Docket Entry # 25, Ex. 10, ¶ 13). The September 2, 2008 letter conspicuously omits a reference to a

41

As previously noted, an estoppel certificate under section 11 allows Noonan to obtain the current outstanding principal balance of the senior indebtedness and the existence of any defaults under the senior and/or the subordinate loan documents.  Section 13 of the ICA gives Noonan "the right" to purchase the senior loan Documents "[u]pon the occurrence of an Event of Default under the Senior Loan Documents."[55]  (Docket Entry # 25, Ex. 10, ¶ 13).

In a September 3, 2008 reply letter to the foregoing request for an estoppel certificate and Noonan's assertion in the same letter of "an ongoing Event of Default with respect to the [first] Promissory Note issued to Anglo," McCardle pointed out that:

> As of this date, we have not declared the existence of an Event of Default under the Senior Loan, nor have we sent written notice of default to [Realty].  If and when we do so, we will provide you with copies of all such notices of default as required under the Intercreditor Agreement.  We reserve our right to waive defaults and extend the Senior Loan on terms satisfactory to us and/or to sell the Senior Loan to a third-party prior to the occurrence of an Event of Default thereunder, subject to your rights under the Intercreditor Agreement.

---

purchase price determined by Anglo.  At best, the September 2, 2008 letter is a request for an estoppel amount to give Noonan the information necessary to exercise his right to make the purchase.  That said, it remains a genuine issue of material fact as to whether Noonan subsequently exercised that right which Anglo denied.

[55]  The language refers to the "occurrence of an Event of Default" as opposed to "upon notice" of a default or an event of default.

(Docket Entry # 25, Ex. 50).  The reply letter included the current outstanding balance of the senior loan ($10,303,720.71) and advised Noonan that the bank would consider any proposal to purchase the senior loan documents he submitted.  It also asked Noonan to include a time frame for a purchase in any such proposal.  In the reply letter, McCardle also confirmed various defaults with the following statement, "Regarding ongoing defaults with respect to the Senior Loan, we can confirm the following:  (a) The Senior Loan matured on August 31, 2008; (b) interest is past due on the Senior Loan; and (c) real estate taxes are past due."  (Docket Entry # 25, Ex. 50).

The record does not contain an express proposal from Noonan with a requested purchase price and a time frame.  Viewing the record in favor of Noonan for purposes of the Wonderland defendants' summary judgment motion, McCardle flatly informed Noonan on September 10, 2008, that Anglo would not sell him the first loan.  (Docket Entry # 25, Ex. B, ¶ 21; Docket Entry # 52, ¶ 15).[56]  Aidan Hume ("Hume"), Anglo's Executive Vice President,

_____

[56]  Noonan's recitation of what McCardle told him is not hearsay.  See Rule 801(d)(2)(C) & (D); Fischer v. Forestwood Co., Inc., 525 F.3d 972, 984 (10th Cir. 2008) ("[a]s president, he was 'authorized' by Forestwood 'to make a statement concerning' hiring and firing") (citing Rule 801(d)(2)(C), F.R.E.); Schweitzer v. Teamster Local 100, 413 F.3d 533, 538 (6th Cir. 2005) ("reasonable to surmise that a Secretary-Treasurer of a union has the authority to make a statement on behalf of the union" under Rule 801(d)(2)(C), F.R.E.); U.S. v. Agne, 214 F.3d 47, 54-55 (1st Cir. 2000) (discussing Rule 801(d)(2)(D)); Woodman v. Haemonetics Corp., 51 F.3d 1087, 1094 (1st Cir. 1995)

recalls a conversation with Noonan in which he asked Noonan to buy back the bank's position and to which Noonan responded that "he might just do that." (Docket Entry # 34). McCardle and Hume uniformly attest that Noonan did not get back to Anglo with a proposal.[57] (Docket Entry # 34; Docket Entry # 18, ¶ 8).

Noonan continued to object to the ongoing reduction in the value of his loan resulting from the increase in principal to the first promissory note.[58] By letter dated September 16, 2008, Noonan advised Realty that the "option agreement transactions" described to him during an August 27, 2008 lunch with Sarkis constitute defaults under the second mortgage and the second promissory note. (Docket Entry # 25, Ex. 52). A September 30, 2007 letter from Noonan to McCardle and another Anglo official

_____

(discussing Rule 801(d)(2)(D)). Moreover, neither Anglo nor the Wonderland defendants move to strike as hearsay Noonan's averments that, "McCardle told me flatly he would not 'sell' the Senior Loan to me" and/or "informed me that [Anglo] would not sell me the First Loan." (Docket Entry # 25, Ex. B, ¶ 21; Docket Entry # 52, ¶ 15).

[57] The summary judgment record, viewed in favor of Noonan for purposes of the cross motion for summary judgment (Docket Entry # 35) or viewed in favor of the Wonderland defendants for purposes of Noonan's summary judgment motion, therefore contains genuine issues of material fact regarding whether Noonan exercised his right to purchase the senior loan documents under section 13 of the ICA.

[58] Noonan explicitly stated that the modification in August without his consent created a new loan of $1,000,000 "which reduces and impairs my subordinated collateral position, by increasing [Realty's] first mortgage debt from $8.82 million to $9.82 million." (Docket Entry # 25, Ex. 51).

identified the foregoing defaults as well as the option
transaction with SSRA and another amendment to the loan documents
detailed infra as defaults and as lacking Noonan's consent.

E.   October 2008 Amendments and Options

On October 28, 2008, Anglo and Realty extended the maturity
date in the first promissory note to December 31, 2009, and
increased the interest rate by one percent in a document
captioned Second Note Modification Agreement and Amendment of
Loan Documents ("October 2008 note amendment").   Under the
agreement, Realty covenanted that neither it nor Sarkis had made
any concessions for Noonan's benefit under the ICA without
obtaining a release from Noonan of any and all claims against
Anglo.[59]   (Docket Entry # 25, Ex. 64, ¶ 4.2).

On the same day, Anglo and Realty amended the first mortgage
in a document entitled Second Amendment of Security Instruments

---

[59]   The relevant provision reads as follows:

It is a condition of Lender's obligations under this
Agreement, and Borrower covenants, that, prior to the
effective date hereof and while it is in effect, neither
Borrower nor Charles F. Sarkis as guarantor under the
Guaranty, . . ., shall have made or will make any concession
or given any consideration to or for the benefit of E. Mark
Noonan or his successor or assigns . . . in respect to that
certain Intercreditor and Subordination Agreement . . .
without simultaneously obtaining from Noonan in writing . .
. (a) an extension of the term of the Subordinate Note . .
., (b) a release by Noonan of any and all claims against
Lender and (c) Noonan's consent to this Agreement and to all
prior and contemporaneous amendments to the Loan Documents.

(Docket Entry # 25, Ex. 64, ¶ 4.2).

("October 2008 mortgage amendment").[60]  The agreement increased
the loan to value ratio of the first mortgage from 60 to 70
percent.  It also added a new provision requiring prior notice to
constitute an event of default under the senior loan documents
for events that previously lacked a notice requirement.  In
addition to increasing collateral, the October 2008 mortgage
amendment thus added the following section 8.18 to the first
mortgage:

> In the case of a default under the Mortgage, the Note or any
> of the Other Documents which is susceptible of cure and for
> which no grace or notice period is specified elsewhere
> herein, except for a default described in Section 8.6
> hereof,[61] such default shall not constitute an Event of
> Default until such default shall have continued for more
> then ten (10) days after notice thereof from [Anglo] to
> [Realty] in accordance with section 11.1.

(Docket Entry # 25, Ex. 65, ¶ 11).

Also on October 28, 2008, Anglo and Sarkis entered into a
Second Amendment and Ratification of Guaranty and Environmental
Indemnity Agreement ("Sarkis loan purchase option") that gave
Sarkis the option to purchase the senior loan documents.[62]

---

[60]  The October 2008 note amendment and the October 2008
mortgage amendment are collectively referred to as "the October
2008 amendments."

[61]  This section concerned insurance coverage for the
property.

[62]  The Sarkis loan purchase option gave Sarkis an option to
purchase "the Loan Documents" as "that term is defined in the
Second Note Modification."  (Docket Entry # 25, Ex. 62, ¶ 1)
(parentheses omitted).  The latter document (Docket Entry # 25,
Ex. 64) defines the "Loan Documents" as including the first

Notably, the option gave Sarkis the right but not the obligation to purchase the senior loan documents "*prior* to the occurrence of an Event of Default" albeit "subject to the rights, if any, of Noonan."[63]  (Docket Entry # 25, Ex. 62, ¶¶ 1 & 4) (emphasis added).  The relevant language appears in sections one and four:

> 1.  At any time (a) prior to the occurrence of an Event of Default under the Loan Documents . . . and (b) ending on the date the Loan matures, Charles F. Sarkis ("Optionee") shall have the right, but not the obligation, to purchase the Loan Documents . . . for a purchase price equal to the sum of the outstanding principal balance of the Loan, all accrued but unpaid interest, default interest . . .
>
> 4.  The assignment of the Loan Documents to Optionee . . . shall be subject to the rights, if any, of Noonan under the Intercreditor Agreement . . . .

(Docket Entry # 25, Ex. 62, ¶¶ 1 & 4).

Again on the same date, Anglo and SSRA executed a Loan Purchase Option Agreement ("the SSRA loan purchase option"),

---

mortgage and the first promissory note, i.e., the senior loan documents.

[63]  Under the ICA, as previously indicated, Noonan had the right but not the obligation to purchase the senior loan documents only "[u]pon the occurrence of an Event of Default under the Senior Loan Documents."  (Docket Entry # 25, Ex. 10, ¶ 13).  Thus, Noonan's right to purchase arose only after or upon the occurrence of an event of default whereas Sarkis had the option to purchase before an event of default.  A reasonable finder of fact could conclude that the Sarkis loan purchase option made it more unlikely that Noonan would be able to exercise his right to purchase the senior loan documents under section 13 of the ICA because now Sarkis had a prior option to purchase and the option was only subject to Noonan's "rights, <u>if any</u>," under the ICA.  (Docket Entry # 25, Ex. 62, ¶ 4) (emphasis added).  In addition, the increase in the interest rate increased the likelihood of a nonpayment of the second loan because of the increase in the cost of the first loan.

acknowledged by Realty and Sarkis, that gave SSRA the option to
purchase the senior loan documents[64] at Anglo's discretion.
Similar to the Sarkis loan purchase option, the event triggering
SSRA's right to purchase included a decision by Anglo, in its
discretion, to sell the foregoing "*prior* to the occurrence of an
Event of Default . . .."[65]   (Docket Entry # 25, Ex. 63, ¶ 1.1)
(emphasis added).

The applicable language in the SSRA loan purchase option
appears as follows in section 1.1:

> Upon the occurrence of a Triggering Event (defined below),
> [SSRA] shall have the right, but not the obligation, to
> purchase from [Anglo], at the Purchase Price (defined
> below), all of [Anglo's] right, title, and interest in and
> to the Loan, the Note and the Loan Documents (such right,
> the "Option Right").  A "Triggering Event" shall mean a
> decision by [Anglo], in its sole discretion, to sell all or
> any portion of [Anglo's] right, title, and interest in and
> to the Note and the Loan Documents . . . prior to the
> occurrence of an Event of Default (as defined in the
> Security Instrument), other than a sale pursuant to the

---

[64]   The agreement extends an option to purchase "the Loan,
the Note and the Loan Documents."  The agreement broadly defines
these terms to include the first mortgage and the first
promissory note, i.e., the senior loan documents.

[65]   The exact language reads "prior to the occurrence of an
Event of Default (as defined in the Security Instrument) . . .."
(Docket Entry # 25, Ex. 63, ¶ 1.1).  In addition to other
documents, the "Security Instrument" included the first mortgage
as amended. (Docket Entry # 25, Ex. 63, p. W01991).  An event of
default under the first mortgage included an event of default
under the first promissory note.  (Docket Entry # 25, Ex. 6, ¶
8.4).  Hence, subject to Anglo's decision to sell, the SSRA loan
purchase option gave SSRA option to purchase the senior loan
documents upon the occurrence of an event under the first
mortgage and the first promissory note, i.e., the senior loan
documents.

Sarkis Loan Purchase Option.
(Docket Entry # 25, Ex. 63, ¶ 1.1).  Under the agreement, Anglo
represented that it "is:  (a) the holder of the Note, free and
clear of any and all liens and encumbrances except for (i) the
rights of Noonan under the Intercreditor Agreement . . .."[66]
(Docket Entry # 25, Ex. 63, ¶ 2.1.1).  In a whereas paragraph,
the SSRA loan purchase option also referred to Noonan as "the
holder of a subordinate mortgage on the Property [who] entered
into" the ICA.  (Docket Entry # 25, Ex. 63, p. W01991).

In short, Anglo gave both Sarkis and SSRA the option to
purchase the senior loan documents prior to the occurrence of an
event of default.[67]  Noonan's right to purchase the senior loan
documents under the ICA arose only after or upon the occurrence
of an event of default whereas Sarkis and SSRA had the prior
ability to exercise an option before an event of default.

_____

[66] Noonan's right to purchase the senior loan documents
under the ICA, however, only arose upon the occurrence of an
event of default under the senior loan documents whereas SSRA's
option arose prior to the occurrence of an event of default.  The
SSRA loan purchase option also contained an indemnity provision
indemnifying Anglo from any claim brought by Noonan.  Finally,
the option expressly disclaimed any intent on the part of Anglo
and SSRA to create third party beneficiary rights in any person
thereby precluding standing to Noonan to make a direct breach of
claim based on the option.  As discussed infra, these actions
support the existence of a breach of the covenant of good faith
and fair dealing implied in the ICA and, in particular, the right
to purchase given Noonan in section 13 of the ICA.

[67] SSRA's right to purchase was subject to certain
conditions precedent.  (Docket Entry # 25, Ex. 63, ¶ 6.1).

49

In yet another agreement on the same day, Westwood, Realty, SSRA, Sarkis and Coastal amended the property option agreement by releasing funds to the city of Revere to pay outstanding real estate taxes on the property ("the letter agreement").  Through CFJS, LLC ("CFJS"), a Delaware limited liability company of which Sarkis is the sole member and manager, the letter agreement required Sarkis to assign the Sarkis loan purchase option to CFJS.  The letter agreement also "cause[d] CFJS to grant SSR an irrevocable power of attorney" giving SSRA all rights regarding the Sarkis loan purchase option.  (Docket Entry # 25, Ex. 66, ¶ 6).

Noonan attests that he did not consent to the foregoing amendments and option agreements including those that gave Sarkis and SSRA the foregoing options to purchase the senior loan documents.  An October 1, 2008 email by an Anglo attorney recognizes the bank's potential liability in the following manner:

> Not to be difficult, but I'm not sure we have the right to block Noonan's purchase right once the default has become an Event of Default by then waiving it after the fact.  I'm concerned that this will be viewed by Noonan as an attempt to deprive him of his prior rights under the Intercreditor Agreement and may subject the bank to claims of bad faith. However, I think we can waive defaults before they become Events of Default without running afoul of Noonan's rights.

(Docket Entry ## 27, 32 & 38, ¶¶ 81; Docket Entry # 25, Ex. 55).
Realty has not made any prepayments to Noonan for a capital event under the second promissory note.

50

By letter dated April 8, 2009, Noonan's attorney formally declared a default in a letter to Realty.  The letter identifies the prior notices of default in the aforementioned September 5 and 16, 2008 letters and a September 12, 2007 email to Dalton.[68] On May 27, 2009, another Noonan attorney sent the same letter to Anglo accompanied by a cover letter.

## DISCUSSION

Noonan seeks summary judgment on Count I (declaratory relief), Count IV (breach of the ICA against Anglo),[69] Count V (breach of the implied covenant of good faith against Realty and Anglo), Count X (equitable subordination of advances against Anglo and Realty) and Count XII (impairment of Noonan's security interest against Realty and Anglo).  In addition to opposing this motion, the Wonderland defendants, SSR and Coastal globally move

---

[68]   The September 12, 2007 email from Noonan to Dalton simply reminded him that the principal and accrued interest of the second promissory note was "due and payable today."  (Docket Entry # 25, Ex. 33).  It was not a notice of default.

[69]   This count encompasses inter alia breach of the ICA due to the increase in the principal by the August 2006 amendments as argued by Noonan in his papers.  Paragraph 56 of the complaint states that the $1,000,000 additional loan and amendments "constituted a breach of the clear and plain meaning of the Intercreditor Agreement" and paragraph 124 of the count repeats and realleges all the preceding paragraphs.  (Docket Entry # 1, ¶¶ 56 & 124).

for summary judgment on all 17 counts in the complaint.[70]   (Docket
Entry # 35).   Anglo likewise moves to dismiss the entirety of the
complaint.   (Docket Entry # 55).   Again, in lieu of addressing
each cause of action, Anglo's arguments attack Noonan's
construction of the loan documents by asserting that it had the
right to amend the loan documents without Noonan's consent,
advance additional sums to Realty and refrain from declaring an
event of default.   Finally, Greyhound Park, Sarkis and Dalton
move to dismiss the breach of fiduciary duty count (Count XI) and
request entry of a separate final judgment.   (Docket Entry # 63).

All of the parties organize their arguments based upon the
key events, to wit, the August 2006 increase in principal and
amendments, the August 2008 transfer of the property option
agreement to Coastal, Noonan's September 2008 attempt to exercise
his option to purchase the senior loan documents and the October
2008 amendments and the loan purchase options to Sarkis and SSRA.
Adhering in part to this framework while also discussing the
counts at issue, this court turns to a construction of the loan
documents in the context of the August 2006 amendments.

I.   The August 2006 Increase in Principal

Noonan submits that the $1,000,000 addition to the
$8,820,000 principal does not take priority over the second loan.

---

[70]   In lieu of attacking each cause of action, the
Wonderland defendants raise a number of global arguments which
this court addresses infra.

He seeks summary judgment under Count X for equitable subordination.[71]  He also argues that the additional amount was a "Capital Event" requiring a "Mandatory Prepayment" to Noonan under the terms of the second promissory note.  According to Noonan, the amendment increasing the principal required his consent in accordance with section 17 of the second mortgage.

In arguing the priority of the $1,000,000 loan, Anglo relies on the language of section 2(b) of the ICA allowing "any and all amendments" and "any and all advances heretofore made or hereafter to be made," section 20 of the ICA allowing the ICA to trump conflicting provisions in the subordinate loan documents[72] and section 9.3(b) of the first mortgage allowing Anglo to extend the time of payment or modify or waive the obligations.  The Wonderland defendants, SSR and Coastal join in these arguments and maintain that Noonan consented to the loan as evidenced by the marketing material Noonan prepared in September 2006.

The ICA dictates the application of Massachusetts law.[73] Massachusetts law construes subordination agreements such as the ICA to give "practical benefits" to the debt given priority.

_____

[71]  Count X seeks a declaration "including but not limited to" that the "$1,000,000 [a]dditional [l]oan" is equitably subordinated to the "[s]econd [m]ortgage."  (Docket Entry # 18).

[72]  Noonan responds that there is no conflict.

[73]  The senior loan documents as well as the second promissory note similarly contain choice of law clauses requiring the application of Massachusetts law.

Grise v. White, 247 N.E.2d 385, 389 (Mass. 1969).  Moreover, such
practical benefits extend "far beyond a mere undertaking of the
subordinator to stand aside and not to compete for a limited fund
until the new priority claim has been satisfied."  Id.; accord
Rosen v. A-H, Inc., 456 N.E.2d 477, 480 (Mass.App.Ct. 1983)
("[s]ubordination agreements are 'consistently' construed to
afford substantial 'practical' benefits to the debt or security
interest given priority").

Ordinary rules of contract interpretation also apply to
subordination agreements.[74]  Chesapeake Investment Services, Inc.
v. Olive Group Corporation, 2003 WL 369682, *5 (Mass.Super. Jan.
30, 2003) (construing subordination agreement and recognizing
that contract language is "construed in its usual and ordinary
sense").  In Massachusetts, a contract is "construed to give it
effect as a rational business instrument and in a manner which
will carry out the intent of the parties."[75]  Shane v. Winter Hill
Federal Savings and Loan Association, 492 N.E.2d 92, 94 (Mass.
1986) (construing letter agreement with first mortgagee allowing

---

[74]  The rules applicable to so called dragnet clauses are
addressed infra.

[75]  Tellingly, Anglo and Realty did not insert into the
first promissory note a covenant requiring Realty to sell the
property two years after the note.  Examining the first
promissory note as a whole and in the context of the related loan
documents, the parties (Anglo and Realty) did not intend to
require Realty to sell the property in two years to pay back the
loan or require Sarkis to flip the property to a developer.

second mortgagee certain rights).  "The words themselves remain the most important evidence of intention."  Id. at 95.  If the words "are plain and free from ambiguity, they must be construed in accordance with their ordinary and usual sense."  World Species List-Natural Features Registry Institute v. Reading, 913 N.E.2d 925, 930 (Mass.App.Ct. 2009); accord Chesapeake Investment Services, Inc. v. Olive Group Corporation, 2003 WL 369682, *5 (Mass.Super. Jan. 30, 2003).

If unambiguous, the terms of a subordination agreement preclude parol evidence that undermines express terms.  See Banknorth, N.A. v. LBM Financial, LLC, 2003 WL 22285428, *3 (Mass.Super. Aug. 29, 2003) (parol evidence rule forecloses reliance on "contents of any preliminary discussions" to undermine "express terms of the Subordination Agreement").  Determining the existence of an ambiguity involves "examin[ing] the language of the contract by itself, independent of extrinsic evidence concerning the drafting history or the intention of the parties."  Bank v. Thermo Elemental Inc., 888 N.E.2d 897, 907 (Mass. 2008).  An ambiguity may exist on the face of the contract "or as applied to the subject matter."  General Convention of New Jerusalem in the U.S. of America, Inc. v. MacKenzie, 874 N.E.2d 1084, 1087 (Mass. 2007); see also Boston Edison Co. v. Federal Energy Regulatory Commission, 856 F.2d 361, 365 (1ˢᵗ Cir. 1988) ("only when the written agreement, as applied to the subject

55

matter, is in some material respect uncertain or equivocal in meaning that all the circumstances of the parties leading to its execution may be shown for the purpose of elucidating, but not of contradicting or changing its terms").  "Contract language is ambiguous 'where the phraseology can support a reasonable difference of opinion as to the meaning of the words employed and the obligations undertaken.'"  Bank v. Thermo Elemental Inc., 888 N.E.2d at 907; President and Fellows of Harvard College v. PECO Energy Co., 787 N.E.2d 595, 601 (Mass.App.Ct. 2003) (same).

Examining the words in the context of the entire writing is a search for the "manifested meaning, not a privately held belief or intent of one party" left uncommunicated "to other parties to the bargain."[76]  Donoghue v. IBC USA (Publications), Inc., 70 F.3d 206, 212 (1st Cir. 1995); accord General Convention of New Jerusalem in the U.S. of America, Inc. v. MacKenzie, 874 N.E.2d at 1087 (when words in "contract are clear, they must be construed in their usual and ordinary sense" thereby precluding admission of "parol evidence to create an ambiguity when the plain language is unambiguous"); Louis Stoico, Inc. v. Colonial

---

[76]  For example, the averments on the part of various individuals, such as Dalton (Docket Entry # 37, ¶ 8) ("No 'Event of Default" has occurred under the Senior and Junior Mortgage") and Noonan (Docket Entry # 25, Ex. B, ¶ 8) ("I had the clear understanding that" during the two year loan period "gaming would be approved in Massachusetts or the Property would be sold") regarding their subjective understandings do not alter the manifested meaning of the words in the ICA and the related loan documents.

Development Corporation, 343 N.E.2d 872, 875 (Mass. 1976) ("circumstances surrounding the making of an agreement must be examined to determine the objective intent of the parties"); ITT Corporation v. LTX Corporation, 926 F.2d 1258, 1263 (1st Cir. 1991) (applying Massachusetts contract law to dispute and quoting First Circuit case in parenthetical that, "'Contracting parties are bound by objective manifestations and expressions, not subjective expectations'"); In re Sunset Hollow Properties, LLC, 359 B.R. 366, 376 (D.Mass. 2007) (construing subordination agreement and recognizing that "'subjective contemplations'" of the parties thereto are immaterial"); Global NAPs, Inc. v. Verizon New England, Inc., 447 F.Supp.2d 39, 45 (D.Mass. 2006) (interpreting contract words "according to their plain meaning" together with surrounding circumstances "to determine the objective intent of the parties") (applying Massachusetts contract law).

Additional recognized rules of contract construction also include the principle that "a contract is to be construed to give a reasonable effect to *each* of its provisions if possible." State Line Snacks Corp. v. Town of Wilbraham, 555 N.E.2d 892, 894 (Mass.App.Ct. 1990) (emphasis added); see Strand v. Herrick & Smith, 489 N.E.2d 179, 182 (Mass. 1986) (letter "construed to give reasonable effect to each of its terms, so as not to render any provision superfluous"); S. D. Shaw & Sons, Inc. v. Joseph

57

Rugo, Inc., 180 N.E.2d 446, 449 (Mass. 1962) ("'interpretation which gives a reasonable meaning to all of the provisions of a contract is to be preferred to one which leaves a part useless or inexplicable'").  Furthermore, words in "'a contract must be considered in the context of the entire contract rather than in isolation.'"  Matthews v. Planning Board of Brewster, 892 N.E.2d 797, 803 (Mass.App.Ct.), review denied, 897 N.E.2d 592 (Mass. 2008).

In addition, where general and more broadly inclusive language in a contract is inconsistent with more specific language, the latter ordinarily prevails.  Lembo v. Waters, 294 N.E.2d 566, 569 (Mass.App.Ct. 1973) ("'[i]f the apparent inconsistency is between a clause that is general and broadly inclusive in character and one that is more limited and specific in its coverage, the latter should generally be held to operate as a modification and pro tanto nullification of the former'"); see generally McDowell v. Von Thaden, 2006 WL 2808092, *1 (Mass.App.Div. Sept. 26, 2006) ("[s]pecific and exact contractual terms are accorded greater weight than general language"); accord Restatement (Second) Contracts § 203(c) ("specific terms and exact terms are given greater weight than general language").  Where two clauses cannot be reconciled and "'a repugnancy is found,'" however, the clause that effectuates the general purpose of the agreement "is entitled to greater consideration than the

other which tends to defeat a full performance, and repugnant words may be rejected in favor of a construction which makes effectual the evident purpose of the entire instrument." Rosen v. A-H, Inc., 456 N.E.2d at 480 (quoting Morrill & Whiton Construction Co. v. Boston, 71 N.E. 550 (Mass. 1904)).

Interpreting the loan agreements also entails considering the parties' subsequent conduct. Indeed, there is oftentimes "no surer way to find out what the parties meant, than to see what they have done."[77] TLT Construction Corp. v. RI, Inc., 484 F.3d 130, 136 (1st Cir. 2007) (applying Massachusetts law); Martino v. First National Bank of Boston, 280 N.E.2d 174, 179 (Mass. 1972) ("'no surer way to find out what parties meant, than to see what they have done'").

Finally, under Massachusetts law, "when several writings evidence a single contract or comprise constituent parts of a single transaction, they will be read together." Federal Deposit Insurance Corporation v. Singh, 977 F.2d 18, 21 (1st Cir. 1992) (construing together a guaranty and a promissory note executed on same day); see, e.g., Chase Commercial Corporation v. Owen, 588

---

[77] Section 11.6 of the first mortgage expressly states that this principle does not apply with respect to "creating any right, claim or cause of action against the Mortgagee . . . in favor of any materialman, supplier, contractor, subcontractor, successor in title to the Mortgaged Property, or any part thereof, or any Leasee or to any other person, corporation or entity, other than the Mortgagee." (Docket Entry # 25, Ex. 6, ¶ 11.6).

N.E.2d 705, 707 (Mass.App.Ct. 1992) (construing as part of single transaction a guaranty and two loan and security agreements executed simultaneously and referencing the other agreements notwithstanding the defendants' argument that they did not sign all three agreements).  Put another way, "Interlocking documents that are part of a single transaction and are interrelated in purpose, must be read together to effectuate the intention of the parties." Matthews v. Planning Board of Brewster, 892 N.E.2d at 803 (internal quotation marks and brackets omitted).  Executed on the same day, the ICA, the holdback agreement, the first and second mortgages and the first and second promissory notes involve the same subject matter and include cross referencing provisions.  See Gilmore v. Century Bank & Trust Co., 477 N.E.2d 1069, 1073 (Mass.App.Ct. 1985) (factors to consider include "simultaneity of execution, identity of subject matter and parties, cross-referencing and interdependency of provisions").  Adhering to Singh and Chase, which involve loan agreements, the ICA, the holdback agreement, the first and second mortgages and the first and second promissory notes are "read together to effectuate the intention of the parties." Chase Commercial Corporation v. Owen, 588 N.E.2d at 707.

With these principles in mind, this court turns to the August 2006 amendments increasing the $8,820,000 principal to $9,820,000.  Section two of the ICA constitutes the specific

provision in the loan documents signed by all relevant parties
that applies to advances, amendments and modifications to the
senior loan documents.  See generally Rush v. Norfolk Electric
Co., Inc., 874 N.E.2d 447, 453 (Mass.App.Ct. 2007).[78]

Under section 2(a), Noonan first agreed to "subordinate"
payment of "[a]ll amounts due" under the "Subordinate Loan
Documents" to "[a]ll amounts due" under the "Senior Loan
Documents."  Under section 2(b), Noonan additionally agreed in
mandatory terms to subordinate the liens and security interests
created by "the Subordinate Loan Documents," a term that includes
the second mortgage and the second promissory note, to the liens
and security interests created by the "Senior Loan Documents" and
"to any and all amendments, modifications, extensions,
replacements" of the "Senior Loan Documents" and "to any and all
advances heretofore made or hereafter to be made under the Senior
Loan Documents pursuant to the terms thereof."

The ordinary and usual meaning of "subordinate" in section
two gives Anglo's liens and security interests priority over

_____

[78]   The Rush court chose to apply indemnification provisions
in a subcontract rather than conflicting indemnification
provisions in a general contract partly because "[t]he
indemnification provisions of the subcontract appear[ed] in an
instrument bargained for and executed by the actual parties
affected (Modern Continental and Harding & Smith)" whereas "[t]he
indemnification provisions of the general contract were not
bargained for by Harding & Smith, and became operative against
that party only by means of an incorporation clause."  Rush v.
Norfolk Electric Co., Inc., 874 N.E.2d at 453.

Noonan's liens and security interests.  See Grise v. White, 247 N.E.2d at 389 (recognizing uniformity of court decisions as to afford basis to treat "subordination agreements as having like effect, as a matter of interpretation in a contract of the term 'subordination'").  The language in section 2(a) and 2(b) also makes the indebtedness and liens created by the subordinate loan documents "subject" to as well as subordinate to the indebtedness and liens created by the senior loan documents.[79]  Like the "subordinate" to language, the "subject" to language evidences an intent that the senior loan documents take priority over the subordinate loan documents.  See Sunset Hollow, 359 B.R. at 376 (language that "'mortgage is subject to a senior mortgage to the Lender'" supported conclusion that first mortgage had priority over second mortgage).

The subordination of the liens created by the "Subordinate Loan Documents" to the liens created by the "Senior Loan Documents" extends to any and all amendments as well as to "any and all advances heretofore made or hereafter to be made under the Senior Loan Documents pursuant to the terms thereof." (Docket Entry # 25, Ex. 10, ¶ 2(b)).  Turning to the latter, use of the words "advances . . . *hereafter to be made*" in the final

---

[79]  The language in the second mortgage repeats the "subject" to language.  (Docket Entry # 25, Ex. 8, p. A1003643) (Noonan's rights are "subject to"  Anglo's rights under the first mortgage).

clause undeniably connotes "any and all" advances to be made in the future.  (Docket Entry # 25, Ex. 10, ¶ 2(b)) (emphasis added).  Examining the textual surrounding of section 2(b) clarifies the meaning of such advances and the reach of the language relative to the increase in principal.  See generally Starr v. Fordham, 648 N.E.2d 1261, 1269 (Mass. 1995) ("'scope of a party's obligations cannot "be delineated by isolating words and interpreting them as though they stood alone"'").

First, the ICA refers to advances heretofore made and hereafter to be made.  Similarly, the holdback agreement depicts an initial advance of $7,350,000 and a later advance of $1,470,000 occurring 12 months after the September 12, 2005 date.[80]  This two part division referring to an immediate advance of $7,350,000 and a subsequent advance 12 months later easily and neatly tracks the language of the ICA dividing the advances between those "heretofore made" (the $7,350,000) and "hereafter to be made" (the $1,470,000).

Second, both the ICA, the holdback agreement and the promissory note uniformly depict the first loan as $8,820,000. The first prefatory paragraph of the ICA defines the "Senior Loan" as the sum of $8,820,000.  It reads that, "Senior Lender

---

[80]  The Wonderland defendants and Noonan agree that the initial advance took place on or about September 12, 2005. (Docket Entry # 18, State Court Records, Complaint & Answer, ¶¶ 33).

63

has agreed to make a first mortgage loan to [Realty] in the principal sum of $8,820,000 (the 'Senior Loan'), which Senior Loan is evidenced by that certain Promissory Note dated September 12, 2005 (the 'Senior Note')."  (Docket Entry # 25, Ex. 10).

Likewise, the holdback agreement makes no reference to advances in excess of the $8,820,000 total.  In fact, it defines the loan in terms of the $8,820,000 amount by stating in the first paragraph:

> We have this day agreed to make a[n] Eight Million Eight Hundred Twenty Thousand Dollar ($8,820,000) (the "Loan") to you in connection with the financing of the Premises.  The Loan will be evidenced by your Promissory Note of even date herewith in the principal amount of Eight Million Eight Hundred Twenty Thousand Dollar ($8,820,000) (the "Note").

(Docket Entry # 25, Ex. 11).

The first promissory note also defines the amount of the first loan as $8,820,000 rather than an amount in excess of that figure or that figure plus funds used to construct a building. See, e.g., Bennett v. Worcester County National Bank, 213 N.E.2d 254, 255-256 (Mass. 1966) (rejecting argument limiting mortgage to principal amount given "obvious purpose" of a clause authorizing bank to charge money to complete a building).  The first paragraph simply states that Realty agrees to pay Anglo "the principal sum of EIGHT MILLION EIGHT HUNDRED TWENTY THOUSAND DOLLARS (US $8,820,000) (the 'Principal Sum'), with interest . . .."  (Docket Entry # 25, Ex. 5).  Immediately left and under the document's title, "PROMISSORY NOTE," again appears the unadorned

figure of $8,820,000.

The first mortgage, another of the ICA's referenced "Senior Loan Documents" in section 2(b), however, defines the note as $8,820,000 "and any and all extensions, renewals and modifications thereof and substitutions thereof, whether *of the same amount or otherwise*." (Docket Entry # 25, Ex. 6, p. W02990) (emphasis added). Construing the principal sum as limited to the $8,820,000 does not render "the same amount or otherwise" language superfluous. See generally Strand v. Herrick & Smith, 489 N.E.2d at 182; S. D. Shaw & Sons, Inc. v. Joseph Rugo, Inc., 180 N.E.2d at 449. The language could refer to an amount lower than the principal sum in the event Anglo did not advance the entire amount by virtue of a default on the part of Realty or other circumstances. The holdback agreement expressly contemplates this scenario. (Docket Entry # 25, Ex. 11, ¶ 3). In any event, the "same amount or otherwise" language does not override the foregoing repeated and consistent definitions of the loan as the sum of $8,820,000 in the promissory note, the holdback agreement and the ICA.

The 60% loan to value ratio of the first mortgage provides additional evidence of Anglo and Realty's intent to enter into a loan limited to the principal sum of $8,820,000. The ratio corresponds exactly to 60% of the lowest end ($14,700,000) of an appraised range of the property as of September 12, 2005.

65

(Docket Entry # 33, ¶ 5).  Finally, the guaranty, also
encompassed within the ICA's definition of the "Senior Loan
Documents," refers to the $8,820,000 principal amount of the
first promissory note.

Thus, the parties used the terms "any and all advances
heretofore and hereafter to be made under the Senior Loan
Documents pursuant to the terms thereof" to mean the $8,820,000
principal sum.  The $8,820,000 principal sum included the
"heretofore" advance of $7,350,000 and the "hereafter to be made"
advance of $1,470,000 12 months later.

The plain meaning of the word "advance" conforms to this
intended interpretation.  In its usual and ordinary sense at the
time the parties entered into the ICA, the word "advance" simply
meant, "The money or goods furnished."  Black's Law Dictionary
(8th ed. 2004); see generally Shane v. Winter Hill Federal Savings
& Loan Association, 492 N.E.2d at 95 & n.6 (using Black's Law
Dictionary (5th ed. 1979) to define the usual and ordinary meaning
of "advance" and "future advance").[81]  "Future advance"
unambiguously meant, "Money secured by an original security
agreement even though it is lent after the security interest has
attached."  Shane v. Winter Hill Federal Savings & Loan

---

[81]  The complete definition in the eighth edition sets out
two meanings, the first being, "The furnishing of money or goods
before any consideration is received in return," and the second
being, "The money or goods furnished."  Black's Law Dictionary
(8th ed. 2004).

Association, 492 N.E.2d at 95.  The ICA, of course, does not use the term "future advance."  It uses the term "advances" with the description "heretofore made and hereafter to be made."  Given the two part advances depicted in the holdback agreement and the repeatedly defined promissory sum of $8,820,000, the parties manifested an intent to give these terms this particular meaning.  See generally Woogmaster v. Liverpool & London & Globe Insurance Co. Limited, 45 N.E.2d 394, 395 (Mass. 1945).  Advances "heretofore made or hereafter to be made" refers to the two part advances in the holdback agreement.

Contrary to Anglo's argument, a construction of the ICA that limits the referenced advances to the repeatedly defined sum of $8,820,000 does not render the language "any and all amendments" (Docket Entry # 25, Ex. 10, ¶ 2(b)) superfluous.  See generally Strand v. Herrick & Smith, 489 N.E.2d at 182.  Such language could encompass amendments for subjects such as interest rates, insurance or matters other than advances.  Given the breadth of the amendments language to which this court now turns, it could also encompass an advance in excess of the $8,820,000 principal.

The amendments language in section 2(b) subordinates the liens and security interests created by the subordinate loan documents "to the liens and security interests created by the Senior Loan Documents and to any and all amendments, modifications, extensions, replacements or renewals of the Senior

67

Loan Documents." (Docket Entry # 25, Ex. 10, ¶ 2(b)). As mentioned, the ordinary and usual meaning of "subordinate" in section 2(b) gives Anglo's liens and security interests and amendments thereto priority over Noonan's liens and security interests. See Grise v. White, 247 N.E.2d at 389-390. Section 2(b) thus makes the liens and security interests created by the second mortgage and the second promissory note subordinate to the liens and security interests created by the senior loan documents and "any and all amendments" and modifications of these documents.

Under Massachusetts law, it is well settled that in choosing between two conflicting or inconsistent clauses, the more limited and specific clause prevails over the more encompassing and general clause such that the latter operates as a modification of the former. See Lembo v. Waters, 294 N.E.2d at 569 (inconsistency "'between a clause that is general and broadly inclusive in character and one that is more limited and specific in its coverage'" generally "'operate[s] as a modification and pro tanto nullification of the former'"); accord Astra USA, Inc. v. Bildman, 914 N.E.2d 36, 55 (Mass. 2009) (noting "cardinal principle of contract interpretation under which a more specific contract provision controls a more general provision on the same issue") (citing Lembo v. Waters, 294 N.E.2d at 569), cert. denied, __U.S.__, 2010 WL 767034 (2010); In re 604 Columbus Ave.

68

<u>Realty Trust</u>, 968 F.2d 1332, 1357-1358 (1st Cir. 1992) (quoting <u>Lembo</u> in parenthetical); <u>see</u>, <u>e.g.</u>, <u>Rush v. Norfolk Electric Co., Inc.</u>, 874 N.E.2d at 453 (acknowledging "'conflicting clauses' rule" in <u>Lembo</u> and applying the more specific indemnification clause as "'more limited and specific in its coverage'" and therefore superceding the general indemnification clause "to the extent that the clauses were inconsistent"); <u>see</u> <u>generally</u> <u>Restatement (Second) Contracts</u> § 203(c) ("specific terms and exact terms are given greater weight than general language"); <u>McDowell v. Von Thaden</u>, 2006 WL 2808092, *1 (Mass.App.Div. Sept. 26, 2006) ("[s]pecific and exact contractual terms are accorded greater weight than general language").

Here, the more specific advances clause addresses the limited subject of an advance in the future.  The language does not allow an advance above and beyond the advance hereafter to be made in 12 months under the holdback agreement.  The broad sweep of the more general amendments clause, however, encompasses any type of amendment including one that allows a future advance as well as one that changes inter alia the maturity date, the tax payments or the requirement to procure insurance.  Viewed in the context of the August 2006 amendments increasing the principal with the additional advance, the two clauses conflict.  Reasoning that the bargaining parties more than likely considered the advances clause to govern the specific subject of advances rather

than the more general amendments clause, the latter prevails and operates as a modification of the amendments clause. See Restatement (Second) Contracts § 203 cmt. e (parties' attention and understanding "likely to be in better focus when language is specific or exact, and in case of conflict the specific or exact terms is more likely to express the meaning of the parties with respect to the situation than the general language"); see also Lembo v. Waters, 294 N.E.2d at 569 (inconsistency between broadly inclusive and more limited clause "'operate[s] as a modification and pro tanto nullification of the former'").

Indeed, Realty and Anglo knew exactly how to avoid this rule of contract construction because they did so in paragraph 11.8 of the first mortgage. That paragraph reads:

> 11.8. Mortgagee may assign, negotiate, or pledge all or any portion of its rights under the Loan Documents or any of them, and, in case of such assignment, Mortgagor shall accord full recognition thereto. *Without limiting the generality of the foregoing*, Mortgagee shall have the right to sell or otherwise grant participations in the Loan to one or more participating financial institutions . . ..

(Docket Entry # 25, Ex. 6, ¶ 6) (emphasis added). The absence of similar language in paragraph 2(b) of the ICA is telling.

The foregoing principle also elucidates why the parties did not need to include additional language in the amendments clause to exclude advances increasing the principal. The presence of the advances clause, which was absent in the language of the subordination agreement construed by the First Circuit in In re

Olympic Mills Corporation, 333 B.R. 540, 555 (1st Cir. 2005),[82]
operated to modify the amendments clause thereby avoiding the
need for the parties to expressly restrict the amendments
language to exclude an advance that increases the principal.

Massachusetts law also requires dragnet clauses for future
advances to employ explicit language when used against an
intervening lender.  See NAB Asset Venture III, L.P. v. Brockton
Credit Union, 815 N.E.2d 606, 609 (Mass.App.Ct. 2004).  Adhering
to the parties' characterization of section 2(b) as a dragnet
clause,[83] the amendments clause in the ICA does not explicitly
refer to an advance, let alone a future advance.[84]  Construing the
amendments clause to include the future advance of $1,000,000
directly contravenes this principle.

In addition, section 9.3 of the first mortgage, although

_____

[82]  The court in Olympic Mills reasoned in the context of
applying Delaware law that, "If the parties intended to limit the
subordinated debt to a specific loan or a specific amount, they
could have clearly stated such a limitation in the Subordination
Agreement."  In re Olympic Mills Corporation, 333 B.R. at 555.
The language used in the ICA has both the broader amendments
clause and the more limited and inconsistent advances clause.  It
thereby differs from the language of the subordination agreement
construed in Olympic Mills.  The case is also distinguishable
because the court did not have the need to discuss the principle
applicable under Massachusetts law that requires a dragnet clause
to use explicit language when applying such a clause to an
intervening lender vis-à-vis a future advance increasing the
principal.

[83]  See fn. 114.

[84]  As previously noted, the advances clause lacks explicit
language and does not refer to a "future advance."

relied upon by Anglo, does not use the word amendments or expressly permit an increase in the amount of payments.  The language allows Anglo to make agreements, "without notice or consent" with respect to Realty, the contracting party, that extend the time or alter the terms for payment.  The exact language refers to agreements to extend the time or alter "the terms of payment," not the *amount* of payment, "of the Obligations."  The language also allows an agreement "*modifying* or waiving any of the Obligations or subordinating, *modifying* or otherwise dealing with the lien or liens securing payment of the Obligations."  (Docket Entry # 25, Ex. 6, ¶ 9.3) (emphasis added).[85]  The meaning of the term modification or modifying is not exact.  See Sierra Club v. Marsh, 907 F.2d 210, 212 (1ˢᵗ Cir. 1990) ("[t]he accepted lexigraphic definitions of the verb 'modify' are vague and, to some extent, internally inconsistent").  It may connote a limitation as opposed to an expansion of the obligations, see Black's Law Dictionary (8ᵗʰ ed. 2008),[86] or it may simply mean any change to the obligations.  See generally Restatement (Third) of Property (Mortgages), ¶ 7.3,

---

[85]  Similarly, section 11.3 of the first mortgage provided that it "may be *modified* or terminated" (Docket Entry # 25, Ex. 6, ¶ 11.3) (emphasis added), as opposed to amended, modified or terminated.

[86]  The definition sets out two meanings, the first being, "A change to something; an alteration," and the second being, "A qualification or limitation of something."  Id.

cmt. (d) (1997) ("combination of a provision in a senior mortgage authorizing future modifications, together with the subsequent agreement of the mortgagor and mortgagee to modify that mortgage, operate[s] much like a future advances mortgage under which future advances are actually made").  Even if the term "modifying" in section 9.3(b) meant amending, the more precise and contoured language in the ICA that discusses both amendments and advances in the same sentence and to which all parties, including Noonan, agreed, provides stronger evidence of the parties' intent regarding a subsequent advance in excess of the principal.  See generally Rush v. Norfolk Electric Co., Inc., 874 N.E.2d at 453 (examining indemnification provisions in subcontract as the "instrument bargained for and executed by the actual parties affected" rather than "indemnification provisions in general contract [that] were not bargained for by Harding & Smith, and became operative against that part only by means of an incorporation clause that, read literally, devours an elephantine agreement").

     The ICA also reveals that Anglo and Realty knew how to use the term "amendments" and they used that term together with the term "modifications" thereby favoring a construction of section 2(b) that modifications differ from amendments.  See S. D. Shaw & Sons, Inc. v. Joseph Rugo, Inc., 180 N.E.2d at 449 (preferring "'interpretation which gives a reasonable meaning to all of the

73

provisions of a contract'" rather than "'one which leaves a part useless or inexplicable'").  Section 2(b) also shows that Anglo and Realty, both parties to the ICA, knew how to use the broader term "amendments" but neglected to use it in section 9.3 of the first mortgage.

Finally, this construction of section 2(b) still remains consistent with the overall purpose of the ICA which was to benefit Anglo.  Thus, the ICA expressly recognized that Anglo was "unwilling to make the Senior Loan" to Realty "unless" Noonan subordinated the subordinate loan documents to the senior loan documents.  (Docket Entry # 25, Ex. 10, ¶¶ D & E).  Making the senior loan, defined in the ICA as the principal sum of $8,820,000, subordinate to the $3,929,000 loan effectuates the purpose of a subordination agreement.  It gives priority to the senior loan over the junior loan.  See generally Rosen v. A-H, Inc., 456 N.E.2d at 480 (construing subordination clause and rejecting repugnant words "in favor of a construction which makes effectual the evident purpose of the entire instrument").

It is true, as previously noted, that subordination agreements "afford the debt or security interest" given "priority practical benefits . . . far beyond a mere undertaking of the subordinator to step aside and not compete for a limited fund

until the new priority claim has been satisfied."[87]  Grise v.
White, 247 N.E.2d at 389; see also Rosen v. A-H, Inc., 456 N.E.2d
at 480 (subordination agreements "'consistently' construed to
afford substantial 'practical' benefits to the debt or security
interest given priority").  Affording practical benefits,
however, does not extend to increasing the principal or allowing
a future advance which the parties did not identify with the
requisite explicit language.  See NAB Asset Venture III, L.P. v.
Brockton Credit Union, 815 N.E.2d at 609.

Language in the second mortgage simply provides additional
evidence of the parties' intent to subordinate the first loan to
the second loan.  Therein, Noonan "acknowledge[d] and agree[d]"
that his rights under the second mortgage were "subject to"
Anglo's rights under the first mortgage.  (Docket Entry # 25, Ex.
8, p. A1003643).  This language, like the similar language in a
second mortgage construed by the Sunset Hollow, 359 B.R. at 376
("'which mortgage is subject to a senior mortgage to the
Lender'"), naturally suggests an intent to give the first
mortgage priority over the second mortgage.

In sum, under the language of the ICA, Noonan agreed to
subordinate the right of payment of the amounts due under the

---

[87]  The court in Grise did not enumerate the "practical
benefits" beyond the general benefit of having the subordinator
stand aside and not compete for a limited fund until satisfaction
and payment in full of the debt given priority.

subordinate loan documents to the right of payment of the amounts due under the senior loan documents.  (Docket Entry # 25, Ex. 10, ¶2(a)).  Under section 2(b) in conjunction with the other loan documents, however, he did not agree to subordinate his loan to future advances in excess of the principal.  Neither the ICA nor the first mortgage and first promissory note explicitly allow the future advance of $1,000,000 in the form of an amendment to the senior loan documents.

Realty used the advance to pay overdue taxes, accrued interest to Anglo, operating shortfalls[88] and fees and expenses for the loan increase.  Although the record weighs in Noonan's favor, whether Noonan consented to the advance as shown in part by his subsequent conduct remains a genuine issue of material fact.

II.   The ICA and Noonan's Consent

Before turning to the specific counts addressed in Noonan's motion, it is important to recognize that in most contexts other than an increase in the principal via a future advance the ICA did not require Noonan's consent for amendments, modifications or extensions of the maturity dates for the senior loan documents.[89]

_____

[88]   Under the second promissory note, Noonan and Realty agreed that use of the proceeds of Noonan's loan other than inter alia "as short-term working capital" was an event of default. (Docket Entry # 25, Ex. 7, p. A1003638).

[89]   Consent was required for the future advance increasing the principal.  As already explained, the advance was not within

First, section 2(b) does not include language requiring Noonan's consent.  Second, as shown in section five of the ICA, the parties knew how to require written consent inasmuch as they required Noonan to obtain Anglo's consent before amending the subordinate loan documents.[90]  Conspicuously absent in section two or elsewhere in the ICA is a provision requiring Anglo to obtain Noonan's consent to amend the senior loan documents.  See generally Chatham Pharmaceuticals, Inc. v. Angier Chemical Co., 196 N.E.2d 852, 854-855 (Mass. 1964).

Third, the "Senior Loan Documents" is, as previously mentioned, a defined term in the ICA (Docket Entry # 25, Ex. 10, ¶ B) that does not include the second mortgage with the consent provision.  The overall scheme of the ICA in the context of the other loan documents distinguishes and subordinates the "Subordinate Loan Documents" to "the Senior Loan Documents." (Docket Entry # 25, Ex. 10, ¶ D).  Importing the consent

---

the scope of section 2(b).  Section 2(b) therefore does not supply consent.  Section 9.3 of the first mortgage did not give Anglo the ability to amend the first mortgage to increase the principal with a future advance given the inconsistent, explicit and limiting advances clause in the ICA.  No express agreement exists and whether Noonan's subsequent conduct operates as implied consent to the August 2006 amendments is a genuine issue of material fact.

[90]  As previously noted, section five states that, "Subordinate Lender shall not, without the prior consent of Senior Lender . . . (c) amend or modify any of the terms or provisions of the Subordinate Loan Documents."  The absence of a concomitant provision requiring Noonan's prior consent is again telling.

provision from the subordinate loan documents (Docket Entry # 25, Ex. 8, ¶ 17) to modify the amendments and advances language is contrary to the parties' intent to distinguish the two groups of documents and then subordinate the liens created by the subordinate loan documents to the liens created by the senior loan documents.

Fourth, the consent provision in section 17 of the second mortgage conflicts with the ICA which is devoid of a provision requiring Noonan's consent for an amendment.  Indeed, section two states that the "Subordinate Lender [Noonan] hereby agrees" to the subordination set forth therein.  Section 20 of the ICA, to which both Realty and Noonan agreed, states that, "In the event of any conflict between the provisions of" the second mortgage and the ICA, the provisions of the ICA "shall prevail."  (Docket Entry # 25, Ex. 10, ¶ 20).

Fifth, requiring Noonan's consent is directly contrary to the terms of the first mortgage.  Section 11.6 of the first mortgage disclaimed any intent to create rights in any third party who has a contractual relationship with Realty, i.e., Noonan.  (Docket Entry # 25, Ex. 6, ¶ 11.6).  Section 9.3 of the first mortgage allows Anglo to "make any agreement . . . altering the terms of payment of the Obligations" or "subordinating, modifying or otherwise dealing with the lien or liens securing payment of the Obligations" irrespective of notice or consent.

78

(Docket Entry # 25, Ex. 6, ¶ 9.3).

III.   <u>The ICA's Right to Purchase</u>

Although the ICA did not import a consent requirement into its provisions, it did allow Noonan a significant right. Triggered by a condition precedent of "the occurrence of an Event of Default under the Senior Loan Documents," section 13 of the ICA gave Noonan "the right, but not the obligation, to purchase the Senior Loan Documents for a purchase price" determined by Anglo. (Docket Entry # 25, Ex. 10, ¶ 13). As previously noted, it is a genuine issue of material fact as to whether Noonan exercised that right in September 2008. His ability to exercise the right turns upon the occurrence of an event of default at or prior to that time.[91] Noonan's ability to receive "regularly scheduled payments" under section three of the ICA also turns upon the existence of an event of default.[92]

Having exhaustively described the events of default at issue as well as a number of material facts relative thereto, this court confines its extended discussion to the more promising event of default vis-à-vis Noonan. This event of default is prescribed in section 8.12(a) of the first mortgage, to wit,

---

[91]   The summary judgment record is devoid of evidence that Noonan exercised or attempted to exercise the right to purchase at any other time.

[92]   Section three allows such payments "so long as no Event of Default under any Senior Loan Document has occurred." (Docket Entry # 25, Ex. 10, ¶ 3).

"[t]he insolvency or inability of [Realty] . . . to pay . . . its debts as they mature."[93]   (Docket Entry # 25, Ex. 6, ¶ 8.12(a)).

Turning briefly to the less promising events of default which do not constitute events of default as a matter of law for purposes of Noonan's summary judgment, they include the "[n]onpayment of any installment of principal and/or interest" under the first promissory note or the "[n]onpayment of any other sum" under the first mortgage or the first promissory note. (Docket Entry # 25, Ex. 6, ¶¶ 8.1 & 8.2).  Each such nonpayment required that it continue "for more than ten (10) days after notice thereof from" Anglo to Realty.  (Docket Entry # 25, Ex. 6, ¶¶ 8.1 & 8.2).  Noonan fails to establish that notice was made in conformity with section 11.1 regarding any such nonpayment as a matter of law.  Any argument that the nonpayment of principal falls under the more general "event of default" language which does not contain a notice provision (Docket Entry # 25, Ex. 6, ¶ 8.4) is unavailing.  The more specific "event of default" language in section 8.1 which, inconsistent with section 8.4, contains a notice provision controls.  See Lembo v. Waters, 294 N.E.2d at 569.

The summary judgment record also fails to establish as a matter of law the lapse of insurance within the meaning of

---

[93]   The second promissory note also defines the occurrence of an event of default as the insolvency of Realty.  (Docket Entry # 25, Ex. 7, p. A1003638).

section 8.6.[94]  The nonpayment of taxes under section 5.4, while relevant as to insolvency and an inability to pay debts, required that the nonpayment continue for more than 30 days after notice from Anglo in order to ripen into an event of default under section 8.3.  Again, Noonan fails to establish such notice as a matter of law.  As previously discussed, section 4.6 relative to taxes did not impose a future obligation.[95]

Given the nonpayment of the first loan as of September 12, 2007, Realty's "failure to pay" (Docket Entry # 25, Ex. 8, ¶ 21(a)) or Realty's nonpayment of accrued interest and principal on the second loan at maturity was not an event of default under the second mortgage (Docket Entry # 25, Ex. 8, ¶¶ 21(e), (f) & (g)) because the ICA postponed and subordinated such payment until payment in full of the senior indebtedness (Docket Entry # 25, Ex. 10, ¶ 3).[96]  Similarly, even if the $1,000,000 future

---

[94]  See fn. 19.

[95]  See fn. 20.

[96]  Section three states that, "Until such time as the Senior Indebtedness has been paid in full, the payment of all or any part of the Subordinate Indebtedness shall be postponed and subordinated to the payment in full of the Senior Indebtedness." (Docket Entry # 25, Ex. 10, ¶ 3).  The ICA defines "Subordinate Indebtedness" as "[a]ll amounts due under the Subordinate Note" thereby encompassing any capital event payment to Noonan.  It is undisputed that Anglo has not been paid in full under the first promissory note.

Section three goes on to state that, "so long as no Event of Default under any Senior Loan Document has occurred and is continuing, Subordinate Lender shall be permitted to receive regularly scheduled payments (but not prepayments) as provided in

advance or the property option agreement was a capital event
under the second promissory note, there was no immediate payment
obligation on the part of Realty because section three of the ICA
postponed any such capital event payment.  Thus, Realty did not
fail "to observe or perform" the capital event covenant within
the meaning of the event of default provision of section 21(e) of
the second mortgage.[97]  (Docket Entry # 25, Ex. 8, ¶ 21(e)).  The

---

the Subordinate Loan Documents."  (Docket Entry # 25, Ex. 10, ¶
3).  The existence of "no Event of Default" was therefore a
condition precedent to Noonan receiving a regularly scheduled
payment.  The presence of a material issue of fact vis-à-vis the
existence of an event of default, as discussed infra, precludes
the need to determine if payment at maturity was a "regularly
scheduled payment."  Noonan is only entitled to receive
"regularly scheduled payments" as "long as no Event of Default
under any Senior Loan Document has occurred and is continuing."
(Docket Entry # 25, Ex. 10, ¶ 3).  Noonan is therefore not
entitled to a declaration under paragraph 101 in Count I on
summary judgment.  Construing the record in Noonan's favor, the
Wonderland defendants are not entitled to a dismissal of this
paragraph given the material issue of fact relative to the
existence of an event of default.

[97]  The second promissory note states that, "the Borrower
shall be required to make prepayments to Lender" from the "then-
outstanding principal and accrued interest" in the amount equal
to "the aggregate amount of capital generated by a Capital Event"
after deducting certain costs.  (Docket Entry # 25, Ex. 7).  This
mandatory requirement conflicts with the first sentence of
section three of the ICA which requires that "payment of all or
any part of the Subordinate Indebtedness shall be postponed"
until payment in full of the senior indebtedness.  (Docket Entry
# 25, Ex. 10).  As such, section 20 of the ICA dictates that
section three of the ICA controls and operates to postpone
Noonan's receipt of capital event payments until payment of the
first loan.  The second sentence of section three does not apply
because it governs "regularly scheduled payments (but not
prepayments)."  A "'Mandatory Prepayment'" under the capital
event provision is a "prepayment" within the meaning of the
second sentence of section three of the ICA.

amounts due after maturity on the first promissory note, however, more than likely became subject to a higher rate of interest. (Docket Entry # 25, Ex. 7) ("[A]mounts due under [the first promissory note] after maturity . . . shall bear interest at a rate of fifteen percent (15%)").[98]

Any violation of the loan to value ratio did not ripen into an event of default.  Section 8.16 of the first mortgage requires that a breach of the loan to value ratio continue for more than 30 days after notice from Anglo.  Anglo has yet to issue such a notice.[99]

As to encumbrances under section 16 of the second mortgage, the mortgage does not define the term "encumbrance."  The ordinary meaning of the term connotes "'[a] claim or liability . . . attached to property or some other right and that may lessen its value, such as a lien or mortgage; any property right that is not an ownership.'"  Board of Trustees of Sea Grass Village Condominium v. Bergquist, 2009 WL 1900424, *3 (Mass.App.Div. June 25, 2009) (quoting Black's Law Dictionary, p. 568 (8th ed. 2004)).  An encumbrance "must exist in favor of another person, rendering the land of less value to its owner."  Id. (citing Kellogg v.

---

[98]   The declaratory judgment count does not seek a declaration relative to the increased interest rate.  It is therefore not necessary to definitively decide this issue to rule on the motions subject to this opinion.

[99]   See fn. 16.

Ingersoll, 2 Mass. 97, 101 (1806)).  Section 16 includes "payment of real estate tax payments" as a permitted encumbrance.  Viewing the record in favor of the Wonderland defendants, $491,146 was used to pay taxes owed to the city of Revere with the remaining amount primarily used to pay interest to Anglo operating shortfalls.  The value of the land at the time is factually disputed.  In light of the use of the loan, whether the remaining amount of the loan after tax payments lessened the land's value presents a genuine issue of material fact.  Thus, whether the loan constituted an "encumbrance" within the meaning of section 16 of the second mortgage is a genuine issue of material fact not suitable for summary judgment.[100]

Noonan also argues that the August 2008 property option agreement was an encumbrance.  Section 16 does not, however, expressly constitute an event of default.  The remedy therein is for Realty to discharge the encumbrance within 30 days of the attachment of the encumbrance to the property.  (Docket Entry # 25, Ex. 8, ¶ 16(a)).  Section 21 of the second mortgage lists the events of default and section 16 is not on the list.  Section 21(g) prescribes the "failure to observe or perform any covenant, agreement, condition, term or provision of [the second] Mortgage."  (Docket Entry # 25, Ex. 8, ¶ 21(g)).  Even if

---

[100]  Noonan notified Realty of the encumbrance as a default in the September 16, 2008 letter.

Realty's failure to observe section 16 by allowing an encumbrance falls within the reach of this language, the failure must continue for ten days after written notice.  By the time Noonan gave written notice of the encumbrance as a default (Docket Entry # 77), his attempt and/or exercise in September 2008 of his right to purchase the senior loan documents had already taken place. Thus, the August 2008 property option agreement was not an "occurrence of default" under section 13 of the ICA at the time Noonan exercised his right to purchase.[101]

The August 12, 2008 property option agreement was also not a representation or warranty within the meaning of section 21(c). It was therefore not an event of default under this subsection.[102]

Section 13 of the second mortgage requires Realty to "promptly" notify Noonan of "any security interest" in the property "now existing or hereafter arising" as well as "proceedings or actions . . . affecting" the property.  (Docket Entry # 25, Ex. 8, ¶ 13).  Noonan learned of the August 2006 amendments no later than September 8, 2006.  Noonan learned about

---

[101]  As also previously explained, whether Noonan exercised his right to purchase is a genuine issue of material fact.  In addition, as correctly pointed out by the Wonderland defendants (Docket Entry # 53, ¶ III(D)), whether the property option agreement as well as the Sarkis and SSRA loan option agreements lessened the value of the land is factually disputed and thus not suitable for the declaratory relief sought in paragraphs 105 and 106 of the complaint.

[102]  See fn. 23.

the property option agreement at an August 23, 2008 meeting with Sarkis and Dalton.  (Docket Entry # 52).  Even assuming that Realty did not "promptly" inform Noonan of either the 2006 amendments,[103] the property option agreement and/or the injunction in the Bashien case, the failure did not ripen into an event of default under section 21(g) of the second mortgage because the section required Noonan to give Realty written notice, which took place in April 2009 (Docket Entry # 77), and for the default to continue without cure for at least a period of ten days thereafter.  (Docket Entry # 25, Ex. 8, ¶ 21(g)).  Thus, section 13 of the second mortgage does not provide the required "occurrence of an Event of Default" to trigger the right to purchase under section 13 of the ICA at the time Noonan exercised that right, if at all, in September 2008.

Addressing the more viable event of default, section eight of the first mortgage at the outset states that, "The occurrence of any one or more of the following events shall constitute an Event of Default."  (Docket Entry # 25, Ex. 6, ¶ 8).  One such event is Realty's "insolvency" or its inability to pay "its debts as they mature."  (Docket Entry # 25, Ex. 6, ¶ 8.12(a)).  The ordinary and plain meaning of insolvent is "having liabilities that exceed the value of assets; having stopped paying debts in

_____

[103]  Although the record undoubtedly favors Noonan, the promptness of the notification presents a factual issue.

the ordinary course of business or being unable to pay them as they become due." Black's Law Dictionary (8th ed. 2004). At the time Noonan attempted to exercise his right to purchase the senior loan documents in September 2008, the first mortgage did not include a notice or grace period in section 8.12(a) for this event of default.[104]

As evidenced in the summary judgment record, Realty's financial condition was tenuous having been unable to make the payments of either the first or the second loan at maturity and keep current with tax payments to the city of Revere. The Bashien case, the immediate use of the $100,000 future advance to pay back taxes in excess of $400,000, the overdue interest payments due Anglo, the notices and instruments of taking issued by the city of Revere in 2007, doubts expressed by an independent auditor relative to the consolidated balance sheets of Greyhound Park and Realty as well as a notice of default in May 2008 issued by one of Realty's creditors all combine to establish that Realty

---

[104] Anglo and Realty, each sophisticated entities represented by counsel, could easily have included such a requirement in the first mortgage as they did with respect to other designated events of default. See RCI Northeast Services Division v. Boston Edison Company, 822 F.2d 199, 205 (1st Cir. 1987) (where parties are sophisticated business entities who, represented by attorneys, freely entered into a contract, it is not appropriate for court to rewrite their agreement); Quinn v. Mar-Lees Seafood, LLC, 871 N.E.2d 511, 526 (Mass.App.Ct. 2007) (criticizing lower court for "second-guess[ing] the wisdom of the parties' agreement inasmuch as "agreement and amendment were negotiated at arms' length by sophisticated parties").

was insolvent and/or unable to pay its debts as they matured at and around the time Noonan attempted to exercise his right to purchase.  Given the record before this court, Realty was insolvent as well as unable to pay its debts as they matured under section 8.12(a) of the first mortgage.[105]

The occurrence of Realty's insolvency and inability to pay its debts as they matured thus triggered Noonan's right to purchase the senior loan documents under section 13 of the ICA.[106] Whether Noonan exercised his right to purchase in and around September 2008 is, as previously noted, a genuine issue of material fact.  Anglo's denial of that right in and around late September 2008 is also, as previously noted, a genuine issue of material fact.  Accordingly, whether Anglo breached section 13 by denying Noonan the right to purchase the senior loan documents in September 2008 presents a genuine issue of material fact.

The Wonderland defendants and Anglo seek to avoid or postpone this suit on the basis of the standstill language in the ICA.  Under the ICA, Noonan agreed not to take any action

---

[105]  With respect to Anglo's motion to dismiss, the complaint sets out Realty's nonpayment of debts and facts sufficient to constitute its insolvency.

[106]  Section 15 addresses Anglo's rights as opposed to Noonan's rights.  If section 15 prevented the ability of Noonan to exercise his right to purchase under section 13, the section would render section 13 superfluous in most if not all circumstances.  See Strand v. Herrick & Smith, 489 N.E.2d at 182; S. D. Shaw & Sons, Inc. v. Joseph Rugo, Inc., 180 N.E.2d at 449; State Line Snacks Corp. v. Town of Wilbraham, 555 N.E.2d at 894.

contesting the priority or the validity of "any rights" of Anglo "in and with respect to the Senior Loan Documents or the Property." (Docket Entry # 25, Ex. 10, ¶ 2). The ICA includes additional provisions, previously quoted, barring Noonan from receiving payment or asserting obligations under the subordinate loan documents or commencing an enforcement action unless and until the "Senior Indebtedness" has been paid in full or "satisfied in full." (Docket Entry # 25, Ex. 10, ¶¶ 3, 6 & 10). It is undisputed that the senior indebtedness has not been paid in full. Noonan's present action also contests Anglo's rights with respect to the senior loan documents.

It is well settled that, "'A material breach of contract by one party excuses the other party from performance as matter of law.'"[107] Coviello v. Richardson, 924 N.E.2d 761, 766 (Mass.App.Ct. 2010); accord Astra USA, Inc. v. Bildman, 914 N.E.2d at 56 (noting that material breach of employment contract

---

[107] The Wonderland defendants do not dispute "as a general proposition that a material breach by one party sometimes excuses the other party's performance of a contract." (Docket Entry # 36). Because Noonan fails to "demonstrate a breach of the" ICA, they submit that the principle does not apply. (Docket Entry # 36). Thus, rather than dispute that a particular breach does not operate to excuse Noonan's performance of the ICA, they argue that Noonan has not demonstrated a breach at all of the ICA. See Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 260 (1st Cir. 1999) ("district court is free to disregard arguments that are not adequately developed"); see generally U.S. v. Dyer, 589 F.3d 520, 527 (1st Cir. 2009) (before "district court, Dyer never used the term 'specific intent' to set forth the legal requirements for applying § 2G2.4(c)(2), and has waived the argument").

"as a matter of law excused any further obligation of performance by Astra").  The occurrence of a material breach "is a question of fact ordinarily to be decided by a jury" or the finder of fact.  DiPietro v. Sipex Corporation, 865 N.E.2d 1190, 1197 (Mass.App.Ct. 2007) (citation omitted).  A material or substantial breach occurs when the breach goes to "'an essential and inducing feature of the contract.'"[108]  Lease-It v. Massachusetts Port Authority, 600 N.E.2d 599, 602 (Mass.App.Ct. 1992).

This case is no exception.  Section 13 of the ICA mandates that Noonan "shall have the right" to purchase the senior loan documents upon the occurrence of an event of default.  Whether Anglo materially breached section 13 of the ICA by denying Noonan the right to purchase the senior loan documents prior to the insertion of a notice provision in late October 2008 is a genuine issue of material fact.  It is also a genuine issue of material fact whether Anglo waived the insolvency default under section 9.3 of the first mortgage.[109]  Given these genuine issues of

_____

[108]  With respect to the pending motions (Docket Entry ## 25, 35 & 55), the parties do not argue that section 18 of the ICA bars the application of this principle as the only means to terminate the obligations under the ICA.  See Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d at 260.  This court declines to do so sua sponte.

[109]  In making this finding, this court recognizes and notes McCardle's averment that by October 28, 2008, Realty "had become current on all amounts owed on the [f]irst [l]oan and had cured any prior performance failures to Anglo's satisfaction.  Also by

90

material fact, a reasonable finder of fact could find a material
breach of the ICA which may excuse Noonan's performance and
adherence to the standstill provisions in the ICA (Docket Entry #
# 25, Ex. 10, ¶¶ 2, 3, 6 & 10).

Alternatively and as discussed infra, whether Anglo violated
the covenant of good faith and fair dealing implied in section 13
of the ICA also presents a genuine issue of material fact.  The
materiality of this breach of the ICA likewise presents a genuine
issue of material fact which, if established, may excuse Noonan's
performance and adherence to the standstill provisions.

IV.  Summary Judgment on Counts I, IV, X and XI Relative to the
August 2006 Amendments

Turning to the above counts implicated in Noonan's motion,
Count X seeks to impose liability on the Wonderland defendants
and Anglo under the theory of equitable subordination.  Noonan
seeks summary judgment on the count and the Wonderland defendants
cross move for summary judgment on the count.  To support summary
judgment on this count, Noonan cites to the decision by the
Massachusetts Supreme Judicial Court ("SJC") in Shane.  (Docket
Entry # 26, ¶ II(A)).  Noonan submits that the subsequent August
2006 amendments increasing the principal were prejudicial and
that "'a senior mortgagee may not prejudice the rights or impair

---

that date, Anglo had waived any such performance failures that
had not actually been cured by performance."  (Docket Entry # 33,
¶ 18).

the security of a junior mortgagee.'" (Docket Entry # 26, ¶ II(A)) (quoting Shane, 492 N.E.2d at 95).[110]

At the outset, it is important to recognize that Noonan, Anglo and Realty all agreed to the terms of the ICA. Those terms, however, did not extend or encompass an amendment in the form of a future advance increasing the principal sum by $1,000,000. Thus, the parties did not intend or agree to bind themselves to a future advance increasing the principal sum. Consequently, section 2(b) did not provide Noonan with notice of an amendment to increase the principal with a future advance.

The SJC in Shane considered whether an agreement increasing the interest rate in a first mortgage may bind a second mortgagee[111] when the first mortgagee knew about the junior interest and thereafter entered into the agreement with the

_____

[110] The complaint captions Count X as "equitable subordination" and Count XII as "impairment of security interest." Noonan seeks summary judgment on both counts. Although it may amount to semantics, the cases cited by Noonan in conjunction with Count X, including Shane, do not refer to the doctrine of equitable subordination. See generally East Boston Savings Bank v. Ogan, 701 N.E.2d 331, 334 (Mass. 1998) (setting out the doctrine and applicable factors). Because the body of Count X as well as Shane and the cases cited support Noonan's argument, this court addresses the arguments as applicable to Count X. As to Count XII, the Wonderland defendants, Sarkis and Dalton find it "dubious whether or not impairment of a security interest is even a valid cause of action in Massachusetts" although they proceed to address the merits of the claim. (Docket Entry # 36).

[111] The assignees of the second mortgagee actually held the junior mortgage in Shane. Id. at 92. For ease of reference, this court refers to them as a second mortgagee.

mortgagor to increase the interest rate.  Shane v. Winter Hill
Federal Savings and Loan Association, 492 N.E.2d at 95.  As
stated by the SJC in Shane, "The rule in this circumstance . . .
is that such a later modification of the mortgage by a senior
mortgagee may not prejudice the rights or impair the security of
a junior mortgagee, without the latter's consent."  Id.

        The rule is subject to a caveat.  The Shane court did not
subordinate the interest rate charges that complied with the
terms of the first mortgage.  Id. at 96 (second mortgagee has "no
ground to contest an additional charge in compliance with the
terms of this clause in the first mortgage").  Instead, the court
only subordinated the charge that "exceeds the additional charge
contemplated by the first mortgage."  Id. at 97.  As to the
latter, the court reasoned that the second mortgagee "took its
lien without notice of . . . a prospective increase in the
interest rate of the first mortgage."  Id. at 96; accord Bennett
v. Worcester County National Bank, 213 N.E.2d at 255-256
(rejecting second mortgagee's priority claim to amount above
principal sum because "language of the mortgage makes clear" that
mortgage secured repayment not only of $155,000 note but also
completion of building).

        In the case at bar, the ICA did not expressly or impliedly
allow subsequent amendments which increase the principal sum of
$8,820,000 with a future advance.  As previously explained,

93

although the ICA gave priority to the right of payment and the liens created by the senior loan documents, it did not give priority to a future advance in excess of the principal sum of $8,820,000.  Section 9.3 of the first mortgage likewise did not permit a modification for a future advance because it lacks the necessary explicit language.[112]  See NAB Asset Venture III, L.P. v. Brockton Credit Union, 815 N.E.2d at 609.  Consequently, the foregoing caveat does not apply vis-à-vis the August 2006 amendments increasing the principal with the future advance.

Shane teaches that equitable subordination applies and that consent is required if the increase in the principal resulted in prejudice and exceeded that disclosed and agreed to in the ICA and the senior and subordinate loan documents.[113]  See Shane v.

_____

[112]  This argument independently prevents section 9.3 from encompassing the August 2006 amendments increasing the principal with the $1,000,000 future advance irrespective of the telling absence of language authorizing an "amendment."

[113]  Examples of non-prejudicial risks inherent in the nature of a second mortgagee's security are renewals and extensions of time for payment on the mortgage.  See East Boston Savings Bank v. Ogan, 701 N.E.2d at 335 (second mortgagee "accepts risks inherent in that security" which include "a renewal or an extension of time for payment on the original mortgage").  The ICA allowed amendments except for advances not encompassed by the advances clause, i.e., a future advance in excess of the $8,820,000 principal.  In section 2(b) Noonan agreed to any "amendments" and "extensions" of the senior loan documents.  The first mortgage, in turn, synonymously allows for any "agreement extending the time, or otherwise altering the terms of payment of the Obligations."  (Docket Entry # 25, Ex. 6, ¶ 9.3).  It also defines the first promissory note as including "any and all extensions."  (Docket Entry # 25, Ex. 10, p. W02990).  With respect to extensions of time effectuated prior to a maturity

94

<u>Winter Hill Federal Savings and Loan Association</u>, 492 N.E.2d at 95-96.  Although oftentimes an increase in the principal is prejudicial as a matter of law because it increases the likelihood of the insufficiency of the fund to pay a junior lienor's interest after satisfaction of the increased amount of the senior loan, in the case at bar a reasonable fact finder could find that the loan avoided not only the further financial deterioration of Realty but also a possible bankruptcy filing and a tax foreclosure on the property that would delay further payment.  A reasonable finder of fact could find that avoiding the latter events is beneficial as opposed to prejudicial to Noonan's security interests.  Accordingly, these issues are for the finder of fact to resolve.

To support summary judgment on Count X, Noonan also relies on <u>NAB Asset Venture III, L.P. v. Brockton Credit Union</u>, 815 N.E.2d 606 (Mass.App.Ct. 2004).  <u>NAB</u> involved a "dragnet clause" in a mortgage that secured "all other direct and contingent liabilities of the Mortgagor . . . . hereof due or to become due."  <u>Id.</u> at 607 n.2.  As concluded by the court in <u>NAB</u>, "[I]f lenders intend to retain priority under a dragnet clause for future advances as against intervening lienors, the language

---

date, Noonan thus agreed to such extensions.  It is not necessary at this juncture to decide whether Noonan agreed to extensions of maturity dates made after such dates in order to resolve the pending motions.

effecting that intent should be explicit." <u>Id.</u> at 609.

Adhering to the parties' assumption that section 2(b) is a dragnet clause,[114] "[t]he guiding principle" to construe such a clause "is the determination of the intent of the parties in view of the particular circumstances and the language employed in the mortgage."[115] <u>Financial Acceptance Corporation v. Garvey</u>, 380 N.E.2d 1332, 1335 (Mass.App.Ct. 1978) (dragnet clause in mortgage secured "'payment of all other indebtedness of the Mortgagor to the Mortgagee hereafter arising'"); <u>accord</u> <u>NAB Asset Venture III,</u>

---

[114] Citing <u>NAB Asset Venture III, L.P. v. Brockton Credit Union</u>, 815 N.E.2d at 609 ("if lenders intend to retain priority under a dragnet clause for future advances as against intervening lienors, the language effecting that intent should be explicit"), Noonan reasonably argues that section two is a dragnet clause that requires explicit language.  Neither Anglo nor the Wonderland defendants set forth an argument that section 2(b) as applied to an increase in principal and, in particular, the August 2006 amendments increasing the principal by $1,000,000, is not a dragnet clause.  Instead, citing <u>NAB</u>, the Wonderland defendants submit that the language "explicitly contemplates" future amendments and advances (Docket Entry # 36, pp. 10-11) and Anglo similarly argues that the ICA and section 2(b) expressly and unambiguously reserved the ability to amend thereby allowing the August 2006 amendments (Docket Entry # 56, ¶ A(1); Docket Entry # 31, ¶ I).  Having waived the argument, <u>see</u> <u>Higgins v. New Balance Athletic Shoe, Inc.</u>, 194 F.3d at 260 ("district court is free to disregard arguments that are not adequately developed"); <u>see</u>, <u>e.g.</u>, <u>U.S. v. Dyer</u>, 589 F.3d at 527 (1st Cir. 2009) (before "district court, Dyer never used the term 'specific intent' to set forth the legal requirements for applying § 2G2.4(c)(2), and has waived the argument"), this court adheres to the parties' position and assumes that section 2(b), as applied to a $1,000,000 increase in principal, is a dragnet clause.

[115] This principle is aptly applied to Noonan who, as an intervening lienor, signed and executed the agreement containing the dragnet clause and therefore had full knowledge of the clause.

L.P. v. Brockton Credit Union, 815 N.E.2d at 608 (noting "as
between the debtor and the mortgage holder, we determine the
effect of a dragnet clause by assessing the intent of the parties
in light of the circumstances and language of the mortgage");
Debral Realty v. Marlborough Co-op Bank, 717 N.E.2d 1023, 1025
(Mass.App.Ct. 1999) ("controlling principle" in construing
dragnet clause "is the intent of the parties in light of the
circumstances and the language of the mortgage"); USA Tech Auto
Services, Inc. v. Premier Petroleum Distributors, Inc., 2002 WL
1555107, *4 (Mass.Super. April 26, 2002) ("intent of the parties
is to be determined in construing a dragnet clause and must be
considered in light of the circumstances and the language of the
mortgage"); Aberjona Nursing Center, Inc. v. Porter, 1999 WL
1441927, *3 (Mass.Super. Nov. 19, 1999) ("guiding principle in
construction of a dragnet clause in a mortgage is the
determination of the intent of the parties in view of the
particular circumstances and the language employed in the
mortgage").

Here, the parties did not intend to subordinate a future
advance increasing the $8,820,000 principal.  The language in
section 2(b) of the ICA as well as section 9.3 of the first
mortgage is not explicit and it otherwise does not allow a future
advance.  Indeed, section 2(b) and the related senior loan
documents evidence an intent to disallow an advance above the

97

repeatedly stated principal sum of $8,820,000 and above the advances heretofore made (the $7,350,000) and hereafter to be made (the $1,470,000).

The existence of the genuine issues of material fact regarding Noonan's ability to avoid the standstill provisions, however, as previously discussed, precludes summary judgment on Count X in Noonan's favor vis-à-vis the August 2006 amendments increasing the principal to $9,820,000.  Conversely, viewing the record in Noonan's favor, Realty is not entitled to summary judgment on Count X vis-à-vis the August 2006 amendments increasing the principal to $9,820,000.[116]

As to the breach of contract claim in Count IV against Anglo,[117] for purposes of Noonan's summary judgment motion, Noonan fails to establish as a matter of law that Anglo breached the

---

[116]   Noonan brings Count X against Realty as opposed to all of the Wonderland defendants.

[117]   As currently pled, Count IV is a breach of contract count brought solely against Anglo.  In the event Noonan seeks leave to amend (Docket Entry # 48, n. 6), he must file the proper motion for leave with supporting legal authority, see LR. 7.1, and attach a copy of the proposed amended complaint.  See Clayton v. White Hall School District, 778 F.2d 457, 460 (8th Cir. 1985) ("to preserve the right to amend the complaint, a party must submit the proposed amendment along with its motion").  In addition, the complaint seeks a declaration that Noonan has the right to buy the senior loan documents for a particular price and that Noonan has the right to exercise his remedies because defendants breached their obligations under their respective agreements.  (Docket Entry # 1, ¶¶ 100 & 108).  Incorporating these paragraphs into Count IV (Docket Entry # 1, ¶ 124), the complaint adequately pleads a breach of section 13 of the ICA by Anglo.

ICA, including section 13 of the ICA, or that such breach was a material one.  Noonan has not met his burden showing he is entitled to summary judgment insofar as he claims that Anglo breached the ICA by increasing the loan amount by $1,000,000 and entering into the August 2006 amendments.  As previously discussed, genuine issues of material fact preclude a decision on summary judgment relative to the materiality of Anglo's breach, if any, of section 13.

Noonan also seeks summary judgment on the declaratory judgment count.  In light of the aforementioned genuine issues of material fact, Noonan is not entitled to summary judgment on Count I for the declarations he seeks in paragraphs 100, 102 to 105, 107, 109 and 110 inasmuch as he fails to establish as a matter of law a material breach of the ICA sufficient to excuse his performance and adherence to the standstill provisions.[118]

---

[118]   The foregoing paragraphs in Count I, which address the increase and the August 2006 amendments, respectively request that:

102.  The Court should declare that the purported August 2, 2006 Amendment of Security Interests is invalid and a breach of the Second Mortgage, Second Mortgage Note, Intercreditor Agreement and Senior Loan Documents.

103.  The Court should declare that the August 2, 2006 $1,000,000 Additional Loan and all interest and fees paid thereon are subordinate to the Second Mortgage debt.

110.  The Court should declare that each of the following are Capital Events under the Second Mortgage Note:  (1) the August 2, 2006 $1,000,000 Additional Loan; . . ..

Conversely, viewing the record in Noonan's favor, the Wonderland defendants' motion for summary judgment is denied as to these paragraphs given the genuine issues of material fact.   Noonan is not entitled to the declaration he seeks in paragraph 101[119] and, for reasons discussed in part II, paragraph 106.

As a final matter relative to the August 2006 amendments, Noonan and Realty cross move for summary judgment on Count XII.[120] Count XII seeks recovery against Realty and Anglo for impairment of Noonan's security interest on the basis that they wrongfully added to the $8,820,000 principal amount in the first promissory note and amended the loan to value ratio without Noonan's consent.   (Docket Entry # 1, ¶¶ 173-176).   The Wonderland defendants challenge the claim on the basis that Noonan cannot prove that his security was, in fact, impaired.   (Docket Entry # 36, ¶ IV(B)(4)).

Viewing the record in Noonan's favor for purposes of resolving the Wonderland defendants' summary judgment motion, a

_____

(Docket Entry # 1).   A declaration of the $1,000,000 future advance as a capital event does not, however, entitle Noonan to immediately receive the capital event prepayment.

[119]   See fn. 96.

[120]   Anglo's motion to dismiss does not cite or address Count XII.   See LR. 7.1; Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d at 260; see generally U.S. v. Dyer, 589 F.3d at 527. The argument that various provisions in the loan documents bar Noonan's suit is addressed infra in conjunction with the discussion regarding the presence of a material breach.

reasonable finder of fact could easily conclude that the
$1,000,000 increase in the principal of the first promissory note
impaired Noonan's security.  Conversely and viewing the record in
favor of the Wonderland defendants, the impairment remains a
genuine issue of material fact given the factual dispute
regarding the value of the property.  See Shane v. Winter Hill
Federal Savings & Loan Association, 492 N.E.2d at 96 n.1 (it was
"mere speculation" that agreement increasing interest rate on
first mortgage and note impaired second mortgagee's "security,
without some indication that the property's value has remained
constant or has been reduced").  Summary judgment in favor of
either Noonan or Realty is therefore denied as to Count XII.

     As previously noted, the Wonderland defendants, Sarkis and
Dalton challenge the count as not setting out a valid cause of
action in Massachusetts.  While the count survives the arguments
lodged against it, it may behoove Noonan to reexamine the claim
in the context of this court's decision on Count X and the nature
of the cause of action that the count alleges.[121]

V.   Anglo's Motion to Dismiss

     Anglo moves to dismiss the entirety of the complaint.
(Docket Entry # 55).  When considering a motion to dismiss
pursuant to Rule 12(b)(6), a "court must 'take all factual

------

     [121]  The proper procedure would be to seek leave to amend the
complaint.

allegations as true and draw all reasonable inferences in favor

of the plaintiff.'" Pettengill v. Curtis, 584 F.Supp.2d 348, 362

(D.Mass. 2008) (quoting Rodriguez-Ortiz v. Margo Caribe, Inc.,

490 F.3d 92, 96 (1st Cir. 2007)); see Alternative Energy, Inc. v.

St. Paul Fire & Marine Insurance Co., 267 F.3d 30, 33 (1st Cir.

2001).  To survive a Rule 12(b)(6) motion to dismiss, the

complaint must include factual allegations that when taken as

true demonstrate a plausible claim for relief even if actual

proof of the facts is improbable.  Bell Atlantic v. Twombly, 550

U.S. 544, 555-558 (2007); see Trans-Spec Truck Service Inc. v.

Caterpillar Inc., 524 F.3d 315, 320 (1st Cir. 2008).

Applying this standard, this court limits the record to the

complaint, the documents attached to it and, given the absence of

an authenticity challenge, those "'integral to or explicitly

relied upon in the complaint.'"[122]  Trans-Spec v. Caterpillar, 524

_____

[122]  Hence, the affidavits, including the McCardle affidavit,
are not included in the Rule 12(b)(6) record.  Anglo's argument
in a footnote to dismiss Count XIII improperly relies on facts in
the McCardle affidavit.  Such reliance is incorrect and not part
of the Rule 12(b)(6) record.  The brevis argument also cites
section 15 of the ICA.  Section 15 states that Anglo "shall not
be prejudiced in its rights under this Agreement" by any failure
to act on the part of Realty or Noonan or their non-compliance
with "any agreement or obligation."  (Docket Entry # 25, Ex. 10,
¶ 15) (emphasis added).  The section does not insulate Anglo from
interfering with Noonan's right in section 13 of the ICA to
purchase the senior loan documents.  Anglo's section 15 argument
therefore does not entitle it to dismissal of Count XIII.
Finally, although the general argument regarding a lack or
improper motive or means may have merit, see Pembroke Country
Club, Inc. v. Regency Savings Bank, F.S.B., 815 N.E.2d 241, 246
(Mass.App.Ct. 2004) (legitimate advancement of a bank's own

F.3d 315, 321 (1st Cir.) (quoting <u>Clorox Co. P.R. v. Proctor &</u>
<u>Gamble Comm. Co.</u>, 228 F.3d 24, 32 (1st Cir. 2000), in
parenthetical), <u>cert. denied</u>, 129 S.Ct. 500 (2008); <u>see</u>
<u>Giragosian v. Ryan</u>, 547 F.3d 59, 65-66 (1st Cir. 2008) (court
should consider "'facts and documents that are part of or
incorporated into the complaint'" and "'matters of public
record'"), <u>cert. denied</u>, 129 S.Ct. 2020 (2009); <u>Chatman v. Gentle</u>
<u>Dental Center of Waltham</u>, 973 F.Supp. 228, 232 n.6 (D.Mass. 1997)
(court can consider public records and other documents referred
to in complaint without treating motion as one under Rule 56,
Fed. R. Civ. P.).  Eschewing reliance on legal conclusions in the
complaint,[123] this court accepts the facts in the complaint as
true.  The relevant provisions in the loan documents, most of
which are attached to the complaint, are not repeated.

With few exceptions as to certain paragraphs in the
complaint, Anglo's arguments do not entitle it to dismissal.[124]

_____

economic interest is not "improper" for purposes of a tortious
interference claim) (citing <u>Hunneman Real Estate Corp. v. Norwood</u>
<u>Realty, Inc.</u>, 765 N.E.2d 800, 808-809 (2002), it is not
adequately developed.  <u>See</u> LR. 7.1(b)(1).

[123] For example, this court does not consider the
characterization of the August 2006 amendment[s] as "an Event of
Default" (Docket Entry # 1, ¶¶ 55 & 56); a "'Capital Event'"
within the meaning of the second promissory note (Docket Entry #
1, ¶ 57); a violation of section 16 of the second mortgage
(Docket Entry # 1, ¶ 52); or a breach of the first mortgage or
the ICA (Docket Entry # 1, ¶¶ 56 & 61).

[124] This court focuses the discussion on the arguments
raised by Anglo in the supporting memorandum to the motion to

First, Anglo argues that the ICA allowed the August 2006 amendments advancing the $1,000,000 and, thus, it did not breach the ICA.  According to Anglo, the ICA subordinated the second loan to the August 2006 amendments.  (Docket Entry # 55, ¶ A).

As previously explained, section 2(b) of the ICA and section 9.3 of the first mortgage do not encompass or authorize the amendments.  Section 2(b) did not allow or authorize an increase in the $8,820,000 principal with a future advance in the amount of $1,000,000.  Section 15 of the ICA does not alter this conclusion.

Anglo's related argument that the chapter 93A claim fails because the complaint does not state a claim that Anglo acted contrary to the ICA by advancing the $1,000,000 and thus contrary to public policy likewise fails.  Anglo's future advance was contrary to the ICA as opposed to a lawful enforcement of its terms.  Anglo is therefore not entitled to dismissal of the declarations in paragraphs 102, 103 and 110(1) in Count I.  Based on Anglo's foregoing argument, it is also not entitled to dismissal of counts IV or V and the related declarations in Count I with respect to the claims that Anglo breached the ICA by increasing the loan amount by $1,000,000 and entering into the August 2006 amendments.

Anglo additionally seeks to dismiss any allegation under

_____

dismiss and in the reply brief.

Count IV that it breached the ICA by failing to provide Noonan
with a notice of default consisting of an August 5, 2008 letter
from Anglo to Sarkis.  The letter (Docket Entry # 1, Ex. 10),
which is attached to the complaint and thus part of the Rule
12(b)(6) record, is simply an invoice from McCardle to Sarkis
requesting payment of outstanding interest and fees.  It is not a
notice of default given or received by Anglo within the meaning
of section nine of the ICA.[125]  Thus, Anglo is entitled to
dismissal of that part of Count IV dependent upon exhibit ten as
a notice of default required under the ICA.  (Docket Entry # 1, ¶
69).

That said, Anglo's reliance on McCardle's affidavit to
establish that Anglo never declared or sent a default is
improper.[126]  See Trans-Spec Truck Service, Inc. v. Caterpillar
Inc., 524 F.3d at 321-322.  In addition, section nine of the ICA
is broader than only requiring Anglo "to provide Noonan a copy of
a notice of default that Anglo gives to the borrower," as argued
by Anglo.  (Docket Entry # 56, ¶ A(2), p. 6).  The plain language

_____

[125]  In making this finding, this court relies only on the
letter itself and not on McCardle's affidavit (Docket Entry # 18,
¶ 6) which lies outside the Rule 12(b)(6) record.

[126]  Anglo's citation to Massachusetts state law cases
(Docket Entry # 56, n.1) for this procedural rule, while
appropriate at the time of filing, is no longer appropriate in
light of the removal to this court.  See Knievel v. ESPN, 393
F.3d 1068, 1073 (9th Cir. 2005); Matrix Service Mid Continent v.
Area Rigging & Mill Wright Service, Inc., 2001 WL 1249607, *1
(N.D.Ill. Oct. 15, 2001).

includes "any notice of default or other notice *give[sic]* . . .
by Senior Lender with respect to the Senior Indebtedness . . .."
(Docket Entry # 25, Ex. 10, ¶ 9).  Paragraph 70 of the complaint
states that Anglo failed to provide Noonan with notice of
Realty's defaults.  On a motion to dismiss, this court accepts
this factual statement as true.  Accordingly, the motion to
dismiss is denied insofar as it seeks to dismiss paragraph 70 as
it applies to a breach of contract alleged in counts IV and V.

Anglo next requests a ruling that it did not breach the ICA
by increasing the loan to value ratio in the October 2008
mortgage amendment.  (Docket Entry ## 18 & 56).  Under section
2(b) of the ICA, Noonan agreed to any and all amendments and
modifications of the senior loan documents.  To state the
obvious, the advances clause did not operate as "a modification
and pro tanto nullification," <u>Lembo v. Waters</u>, 294 N.E.2d at 569,
of the amendments clause relative to the loan to value covenant
in the first mortgage because the advances clause did not, as
applied to the loan to value amendment, cover the same issue.
<u>See</u> <u>Astra USA, Inc. v. Bildman</u>, 914 N.E.2d at 55 (noting that
"more specific contract provision controls a more general
provision on the same issue").  For previously stated reasons,
Noonan's consent was not required and section 9.3 of the first
mortgage gave Anglo the ability to modify the covenant by
changing the loan to value ratio.  Hence, Anglo did not breach

106

the ICA or the implied covenant of good faith and fair dealing by amending the first mortgage to increase the loan to value ratio. Insofar as counts IV or V encompasses a breach of the ICA because Anglo increased the loan to value ratio (Docket Entry # 1, ¶¶ 75(3), 105 & 124-133), they are subject to dismissal.[127]

Anglo also maintains that its failure to declare an event of default is a precondition to Noonan's right to purchase under section 13 of the ICA.  The language of section 13, however, provides that it is "the occurrence of and Event of Default" that triggers the right to purchase.  Accordingly, the argument does not require dismissal of the breach of ICA count.

Anglo next argues that the ICA prohibits this lawsuit because of the standstill provisions in the agreement. (Docket Entry # 56, ¶ B); (Docket Entry # 25, Ex. 10, ¶ 2 & 6).  The events of default alleged in the complaint, including the insolvency or inability of Realty to pay its debts, as well as the reliance on section 13 of the ICA and Noonan's attempt to exercise his right to purchase the senior loan documents, provide the foundation for a material breach.  Additional facts in the complaint, taken as true, also make plausible the existence of a

---

[127] Count IV remains in this action, however, based on a number of other allegations that Anglo breached the ICA including inter alia Anglo's alleged breach of section 2(b) relative to the $1,000,000 advance and its alleged breach of section 13.  Count V likewise remains in this action based upon other allegations including the breach of the covenant of good faith and fair dealing implied in section 13 of the ICA.

material breach.   (Docket Entry # 1, ¶¶ 35(e), 47 & 71-73).

Accordingly, the argument does not entitle Anglo to dismissal on

a Rule 12(b)(6) motion.[128]

That said, this court recognizes the purpose of

subordination agreements and that the prioritized debt receives

practical benefits beyond the mere undertaking to stand aside and

not compete for a limited fund.  See Grise v. White, 247 N.E.2d

at 389; Rosen v. A-H, Inc., 456 N.E.2d at 479.  Construing the

ICA in conformity with these principles, there remain a number of

plausible material breaches under the facts of the complaint.

Anglo's reliance on an unpublished decision to support dismissal

is misplaced given the different facts of the case and the

court's affirmation of a ruling on a summary judgment motion as

opposed to a motion to dismiss.  Finally, section 19 of the ICA

does not, as argued by Anglo (Docket Entry # 56, p. 9), mandate

dismissal of this action.

As a final matter, in the *reply* memorandum Anglo raises the

new argument that its tangential connection with the property

option agreement prevents any recovery against Anglo arising out

of that agreement.  Based on this new argument, Anglo moves to

dismiss "all claims against Anglo . . . to the extent based upon

---

[128]   Noonan's reliance on paragraph eight of the ICA and the
interplay of the paragraph with paragraph six of the ICA (Docket
entry # 68, ¶ E) is misguided as a means to avoid the standstill
provisions.

the Option Agreement." (Docket Entry # 58, ¶ B).  Contrary to

Anglo's limited view of the allegations in the complaint, the

complaint alleges that Anglo breached the implied covenant of

good faith and fair dealing in the ICA by inter alia

participating and assenting to the property option agreement.

(Docket Entry # 1, ¶ 132) (Anglo "cooperated and wilfully

participated in, and assented to, the Option Agreement thereby

knowingly committing numerous breaches of the . . . Intercreditor

Agreement").[129]

    The purpose of a reply memorandum is not to file new

arguments that could have been raised in a supporting memorandum.

See Wills v. Brown University, 184 F.3d 20, 27 (1st Cir. 1999)

("[r]eply briefs are to counter the appellee's arguments, not to

offer new theories of error for the first time"); see generally

Rivera Concepcion v. Puerto Rico, 682 F.Supp.2d 164, 170 (D.P.R.

2010) (refusing to consider arguments in reply memorandum because

"[r]eply memorandums in support of dispositive motions are

limited to rebuttal of factual and legal arguments raised in the

opposition"); In re Boston Regional Medical Center, Inc., 328

F.Supp.2d 130, 142-143 (D.Mass. 2004).  Noonan is entitled to an

opportunity to address the arguments particularly as they apply

to the breach of the implied covenant of good faith and fair

---

    [129]  Anglo's unstated argument that it is simply replying to
Noonan's opposition is therefore misguided.

dealing claim in Count V.  See Wills v. Brown University, 184
F.3d at 27 ("argument has to be renewed in the opening brief on
appeal, so that the appellee has a chance to respond"); Keeler v.
Putnam Fiduciary Trust Co., 238 F.3d 5, 10 (1st Cir. 2001)
(argument in "a reply brief is inadequate; '[e]ven if preserved
below, the argument has to be renewed in the opening brief on
appeal, so that the appellee has a chance to respond'").
Although this court will allow Anglo a full and fair opportunity
to raise the argument in a supporting memorandum to any timely
filed future motion, the argument is waived as a means to support
the pending motion to dismiss.[130]  See Hypertherm, Inc. v.
American Torch Tip Co., 2007 WL 2695323, *2 (D.N.H. Sept. 11,
2007) ("moving party cannot raise new arguments and issues in a
reply that it failed to address in the original motion") (citing
Wills v. Brown University, 184 F.3d at 27); EnergyNorth Natural
Gas, Inc. v. Century Indemnity Co., 2007 WL 776124, *1 (D.N.H.
March 15, 2007) ("[a]rguments raised for the first time in a

---

[130]  The same ruling applies to Anglo's belated attempt in
the reply memorandum to argue that even if Noonan's right to
purchase was ripe, Noonan never tendered payment of any part of
the purchase price.  (Docket Entry # 58, p. 7).  The argument is
not a reply to the argument by Noonan that Anglo breached section
13 of the ICA by failing to acknowledge numerous events of
default.  Rather, it is an entirely new argument raised in the
reply memorandum to which Noonan has not had a fair opportunity
to respond.  The above ruling also applies to Anglo's new
argument that it did not act with the purpose of preventing or
frustrating Noonan from receiving the benefits of the ICA in
order to extract benefits from Noonan.  (Docket Entry # 58, ¶ D).

reply brief, however, are waived") (citing <u>Wills v. Brown University</u>, 184 F.3d at 27).

IV.  <u>Summary Judgment on Count V</u>

Noonan also moves for summary judgment on the implied covenant of good faith and fair dealing claim in Count V.  The Wonderland defendants cross move for summary judgment on the count.[131]

Count V alleges that Realty and Anglo violated the covenant because of their repeated attempts to dilute Noonan's rights under the ICA, the second mortgage and the second promissory note.  The complaint alleges or reasonably infers inter alia that section 13 of the ICA gave Noonan the right to purchase the senior loan documents upon the occurrence of an event of default and that Anglo avoided Noonan's right to make such a purchase in September 2008.  The complaint also alleges inter alia that the SSRA loan purchase option giving SSRA a right of first refusal to purchase the senior loan documents directly violated Noonan's right to purchase in the event of an ongoing event of default. (Docket Entry # 1, ¶¶ 47, 71-73, 85, 129 & 132-133).  To support summary judgment, Noonan maintains that Anglo cannot amend the senior loan documents, including the addition of a ten day notice provision in the first mortgage with section 8.18, that has the

_____

[131]  Having already addressed the arguments in Anglo's motion to dismiss, they do not warrant dismissal of the count.

effect of unilaterally changing section 13.  (Docket Entry ## 26
& 49).

     Massachusetts law implies a covenant of good faith and fair
dealing into every contract including the ICA.  See FAMM Steel,
Inc. v. Sovereign Bank, 571 F.3d 93, 100 (1st Cir. 2009).  The
covenant requires that the parties not "'do anything which will
have the effect of destroying or injuring the right of the other
party to receive the fruits of the contract.'"  Nile v. Nile, 734
N.E.2d 1153, 1160 (Mass. 2000); see Uno Restaurants v. Boston
Kenmore Realty, 805 N.E.2d 957, 964 (Mass. 2004) (covenant
"preserved so long as neither party injures the rights of another
to reap the benefits prescribed by the terms of the contract").
"'The scope of the covenant is only as broad as the contract that
governs the particular relationship.'"  FAMM Steel, Inc. v.
Sovereign Bank, 571 F.3d at 100; Chokel v. Genzyme Corporation,
867 N.E.2d 325, 329 (Mass. 2007).  Hence, the covenant does not
supply terms to the ICA "'that the parties were free to
negotiate, but did not, nor does it "create rights and duties not
otherwise provided" for in the contract.'"  FAMM Steel, Inc. v.
Sovereign Bank, 571 F.3d at 100; Chokel v. Genzyme Corporation,
867 N.E.2d at 329 (same).

     "The duty of good faith and fair dealing concerns the manner
of performance" of the contract, Uno Restaurants v. Boston
Kenmore Realty, 805 N.E.2d at 964, as opposed to the negotiation

112

of its terms.  Thus, when performing the obligations of the
contract, the parties must "'remain faithful to the intended and
agreed expectations' of the contract."  Chokel v. Genzyme
Corporation, 867 N.E.2d at 329.

There is, however, no requirement that the plaintiff show
bad faith on the part of the breaching party.  See Nile v. Nile,
734 N.E.2d at 1160 ("[t]here is no requirement that bad faith be
shown").  Rather, "A plaintiff must show a lack of good faith,"
Uno Restaurants v. Boston Kenmore Realty, 805 N.E.2d at 964 n.5,
which may be inferred by the evidence.  See Nile v. Nile, 734
N.E.2d at 1160 ("showing of a lack of good faith is required in
these circumstances, but it may be inferred by evidence").  Anglo
and Realty must therefore be honest in their dealings with Noonan
and "not purposefully injure" Noonan's "right to obtain the
benefit" of section 13 of the ICA.  See Shawmut Bank, N.A. v.
Wayman, 606 N.E.2d 925, 926 (Mass.App.Ct. 1993) ("duty of good
faith would require that the bank be honest in its dealings . . .
and that it not purposefully injure her right to obtain the
benefits of her contract"); accord FAMM Steel, Inc. v. Sovereign
Bank, 571 F.3d at 100 (quoting Shawmut, 606 N.E.2d at 926).  A
breach of the covenant takes place "when one party violates the
reasonable expectations of the other."  Chokel v. Genzyme
Corporation, 867 N.E.2d at 329.

In the case at bar, Noonan had a reasonable expectation that

he had a right to purchase the senior loan documents upon the occurrence of an event of default as stated in section 13 of the ICA.  At the time the parties entered into the ICA, certain events of default in the senior loan documents did not require notice.  During the performance of the ICA, Noonan attempted to exercise his right to purchase in September 2008.  Viewing the record in Noonan's favor for purposes of resolving the Wonderland defendants' summary judgment motion, Anglo rejected and denied Noonan that right in late September 2008.  Anglo and Realty then agreed to change the definition of "the occurrence of an event of default" in section 13 by amending the first mortgage to include a grace or notice period exercisable by Anglo.  (Docket Entry # 25, Ex. 65, ¶ 11).  While Anglo had the ability to modify the first mortgage (Docket Entry # 25, Ex. 6, ¶ 9.3), it also had the duty not to purposefully injure Noonan's right to purchase the senior loan documents upon the occurrence of an event of default.  Given the timing of the October 2008 amendments shortly after Noonan's attempt to exercise his right to purchase, an inference of a lack of good faith on the part of Anglo and Realty readily arises.

Additional facts and circumstances in the record, such as those set forth in footnotes 63 and 66, suggest a lack of good faith on the part of Realty and Anglo as well as purposeful conduct to injure Noonan's right to exercise his right to

purchase the senior loan documents.  In essence, a reasonable finder of fact could find that Anglo and Realty changed the section 13 provision that Noonan agreed to in the ICA by changing the definition of an event of default and entering into loan purchase options that, even with the acknowledgments of Noonan's right, did not contain language sufficient to preserve the agreed and reasonable expectations of that right.

Viewing the record in favor of the applicable non-moving party, neither Realty nor Noonan is entitled to summary judgment on Count V.

V.   Count XI

Greyhound Park, Sarkis and Dalton move to dismiss the breach of fiduciary duty claim Noonan brings against them in Count XI. They argue that Delaware law applies to the claim and that such law bars a direct breach of fiduciary duty claim against a director as well as a corporation even when the corporation is insolvent or within a zone of insolvency.  (Docket Entry # 63). In particular, they submit that:  (1) Delaware law applies to the breach of fiduciary duty claim; (2) assuming that Greyhound Park is either insolvent or operating within the zone of insolvency, Delaware law does not allow a creditor of a corporation to bring a direct claim against the corporation or its officers and directors; and (3) the complaint fails to adequately allege facts that Realty is insolvent or within the zone of insolvency.

115

(Docket Entry ## 64 & 66).

Noonan responds that Sarkis and Dalton are syphoning funds belonging to Realty to other entities that they control such as Westwood.  For example, Sarkis and Dalton used an asset belonging to Realty, i.e., the property, and sold an option to purchase the property to Coastal with the proceeds going to Westwood as opposed to Realty.  According to Noonan, Delaware law gives him a derivative claim against Greyhound Park, Sarkis and Dalton and that any absence of a "'direct' claim against them is nothing but a procedural quibble."  (Docket Entry # 68).  Unfortunately for Noonan, it is not a procedural quibble and Count XI is subject to dismissal.

The previously stated standard of review applicable to Anglo's motion to dismiss applies to Greyhound Park, Sarkis and Dalton's motion to dismiss.  Their citation and reliance, although limited (Docket Entry # 64, n. 2 & 5), upon Dalton's affidavit (Docket Entry # 18) is inapt.  As previously stated, Rule 12(b)(6) confines the record to the factual allegations in the complaint and the attached documents except for certain limited exceptions.  Facts are construed in Noonan's favor.

A.   Factual Background

Without going into detail because the complaint sets out the factual allegations and attaches the loan documents previously described and quoted at length, the record shows the following.

116

Noonan loaned Realty the $3,929,000 as a subordinated lender under the ICA on September 12, 2005.  By August 2, 2006, Realty had expended not only the initial $7,350,000 advance but also "the remaining holdback funds constituting the full principal amount of the $8,820,000 Senior Loan."  (Docket Entry # 1, ¶ 34).

The September 12, 2007 maturity date passed without a payment and as of September 12, 2008, Realty owed Noonan $5,957,967 with interest accruing at a rate of 15%.  With the additional $1,000,000 advance and the $8,820,000 original loan, Realty owed the bank with interest in excess of $9,820,000.  In the fall of 2008, Realty also owed $800,000 in back taxes to the city of Revere.  In August 2008, the property appraised at an approximate value of $15,000,000.  For purposes of resolving the motion to dismiss, this court assumes that Realty owed debt in excess of its assets even accounting for revenue generated by leases.

The August 2008 property purchase option required Coastal to deposit funds into escrow.  Upon satisfactory evidence of certain requirements, Coastal agreed to release funds to Westwood as opposed to Realty.  Dalton, as President and Chief Executive Officer, executed the agreement on behalf of Westwood.  He also executed the agreement on behalf of Realty as President and Chief Executive Officer of that entity.  Sarkis executed a related term sheet.

117

Sarkis and Dalton control an integrated operation consisting of Realty, Greyhound Park and Wonderland Parking. Dalton is "the sole officer and a director of Greyhound Park." (Docket Entry # 1, ¶ 168). "Sarkis is a director of Greyhound Park." (Docket Entry # 1, ¶ 168). Greyhound Park is the Manager of Realty and controls that entity.

B.  <u>Discussion</u>

Under Count XI, Noonan attempts to assert liability for breach of a fiduciary duty against Greyhound Park arising out of its management and control of Realty. Realty is the corporation that Noonan submits is insolvent or operating in the zone of insolvency. Count XI also seeks to impose liability for breach of fiduciary duty against Dalton as an officer and director of Greyhound Park and Sarkis as a director of Greyhound Park. As explained below, because there is no direct (as opposed to derivative) claim for breach of fiduciary duty against Realty, even assuming its insolvency or its operation within the zone of insolvency, there is no direct claim against Realty's corporate manager and its officer and directors.

Turning to what law applies, Noonan fails to address the choice of law issue explicitly raised by Greyhound Park, Dalton and Sarkis in part III(B) of the supporting memorandum to the

motion to dismiss.[132]   Instead, Noonan relies primarily on

Delaware cases to argue the viability of Count XI.[133]   Thus, the

parties concur that Delaware law applies.   Given this plausible

choice, Delaware substantive law applies to the breach of

fiduciary duty claim.   See generally Cochran v. Quest Software,

Inc., 328 F.3d 1, 6 (1st Cir. 2003) ("when the parties have

reached a plausible agreement about what law governs, a federal

court sitting in diversity jurisdiction is free to forgo

independent inquiry and accept that agreement").[134]

        In accord with other jurisdictions, Delaware law establishes

---

[132]   In opposing the motion, Noonan argues that he has a
viable derivative breach of fiduciary claim but completely fails
to address the choice of law issue raised by Greyhound Park,
Dalton and Sarkis.

[133]   Realty, the insolvent entity, is a Delaware corporation.
Noonan does not argue that Massachusetts state law applies
because Greyhound Park is a Massachusetts corporation.   The issue
is therefore decidedly waived.   See Higgins v. New Balance
Athletic Shoe, Inc., 194 F.3d at 260; see also U.S. v. Dyer, 589
F.3d at 527 (before "district court, Dyer never used the term
'specific intent' to set forth the legal requirements for
applying § 2G2.4(c)(2), and has waived the argument").   The
waiver applies to a direct claim in the complaint as well as a
derivative breach of fiduciary duty claim against these parties
in any future amended complaint in this action.

[134]   Anglo removed this action from Massachusetts state court
on the basis of 28 U.S.C. § 1441(d) and the Foreign Sovereign
Immunities Act ("FSIA"), 28 U.S.C. § 1603, in light of its
nationalization by the Republic of Ireland in January 2009.
Under 28 U.S.C. § 1441(d), "any civil action brought in a State
court against a foreign state as defined in section 1603 of this
title may be removed by the foreign state to the district court
of the United States for the district and division embracing the
place where such action is pending."   Jurisdiction therefore
arises under the FSIA.

that directors such as Dalton and Sarkis "'owe fiduciary duties
of care and loyalty to the corporation and its shareholders.'"
<u>Schoon v. Smith</u>, 953 A.2d 196, 206 (Del. 2008).  Shareholders can
maintain a derivative claim against the corporation and its
directors and a direct claim only by "demonstrat[ing] that they
suffered the alleged harm and that they would receive the benefit
of any recovery."  <u>In re Transkaryotic Therapies, Inc.</u>, 954 A.2d
346, 371 n.112 (Del.Ch. 2008).  To state the obvious, Noonan is
not a shareholder.  He is a creditor of Realty.  As noted by the
Delaware Supreme Court, whereas "shareholders rely on directors
acting as fiduciaries to protect their interests, creditors are
afforded protection through contractual agreements, fraud and
fraudulent conveyance law, implied covenants of good faith and
fair dealing, bankruptcy law, general commercial law and other
sources of creditor rights."  <u>North American Catholic Educational
Programming Foundation, Inc. v. Gheewalla</u>, 930 A.2d 92, 99 (Del.
2007).

The <u>Gheewalla</u> decision decisively and unambiguously sets out
the relevant rules.[135]  First, reasoning that creditors oftentimes
receive bargained for protections with "strong covenants, liens
on assets and other negotiated contractual provisions," the

---

[135]  Such rules have the benefit of giving directors
"brightly lined channel markers as they navigate with due care,
good faith, [and] loyalty on behalf of a Delaware corporation and
its shareholders."  <u>Id.</u> at 101.

<u>Gheewalla</u> court held "that no direct claim for breach of
fiduciary duties may be asserted by the creditors of a solvent
corporation that is operating in the zone of insolvency."   <u>Id.</u> at
101.   Second, because creditors replace shareholders as "the
residual beneficiaries of any increase" in the value of an
insolvent corporation, "creditors of an insolvent corporation
have standing to maintain derivative claims against directors on
behalf of the corporation for breaches of fiduciary duties."   <u>Id.</u>
at 101-102.   Third, "creditors of a Delaware corporation that is
either insolvent or in the zone of insolvency have no right, as a
matter of law, to assert direct claims for breach of fiduciary
duty against its directors."   <u>Id.</u> at 103.

Count XI pleads a direct breach of fiduciary duty claim
against Greyhound Park, Dalton and Sarkis.   Delaware law
emphatically rejects such a claim.   As the distinctions drawn by
the <u>Gheewalla</u> court also evidence, the difference between direct
and derivative claims is not a procedural quibble.   Although
Noonan may file a motion for leave to file an amended complaint
to bring a derivative breach of fiduciary duty claim under
Delaware law against the foregoing parties, the present direct
claim is subject to dismissal.

Greyhound Park, Dalton and Sarkis additionally move for a
separate and final judgment under Rule 54(b), Fed. R. Civ. P.
("Rule 54(b)").   Rule 54(b) "allows the entry of judgment on a

subset of the claims asserted in a multi-plaintiff, multi-claim action." Gonzalez Figaro v. J.C. Penney Puerto Rico, Inc., 568 F.3d 313, 317 (1st Cir. 2009). Certification under Rule 54(b) requires a two part determination "that (i) the ruling in question is final and (ii) there is no persuasive reason for delay." Id.

Ordinarily, issuance of separate final judgments "should not be indulged as a matter of routine or as a magnanimous accommodation to lawyers or litigants." Spiegel v. Trustees of Tufts College, 843 F.2d 38, 42 (1st Cir. 1988); see Willhauck v. Halpin, 953 F.2d 689, 701 (1st Cir. 1991) (Rule 54(b) creates "an exception to the longstanding prudential policy against piecemeal appeals"). Instead, separate final judgments under the rule "must be reserved for the unusual case in which the costs and risks of multiplying the number of proceedings and of overcrowding the appellate docket are outbalanced by pressing needs of the litigants for an early and separate judgment as to some claims or parties." Spiegel v. Trustees of Tufts College, 843 F.2d at 42.

The present circumstances are neither unusual nor pressing. In addition, Greyhound Park is named in a reach and apply count and the declaratory relief in Count I is sought against "defendants." Accordingly, a separate final judgment is not advisable.

122

VI.  <u>Second Summary Judgment Motion</u>

On May 3, 2010, Noonan filed the second summary judgment motion.  (Docket Entry # 96).  Noonan objects to the evisceration of his rights under the subordinate loan documents and the ICA in connection with transactions that took place in February 2010. The Wonderland defendants, Anglo, intervenor CBW Lending, LLC ("CBW Lending") and SSR oppose the motion.  (Docket Entry ## 112, 115 & 121).

A.  <u>Factual Background</u>[136]

On November 24, 2009, SSRA exercised its right to extend the property option agreement, due to expire on December 1, 2009, for another year.  (Docket Entry # 25, Ex. 46, ¶ 5(C); Docket Entry # 85, Ex. B).  Pursuant to the terms of the property option agreement, SSRA agreed to pay Westwood the $1,800,000 option fee in monthly installments of $300,000 during the first six months of the one year term.

By letter dated February 1, 2010, Anglo extended the existing maturity date of the first promissory note to March 15, 2010.  On February 12, 2010, CBW Lending was formed as a Delaware limited liability company.  A few days later, CBW Lending registered to do business in Massachusetts.  The request for a

---

[136]  This court has reviewed and considered all of the documents in the record vis-à-vis the second summary judgment motion.  The factual background is relatively brief due to the resolution of the motion on procedural grounds.

certificate to do business in Massachusetts identifies Coastal Belmont LLC ("Coastal Belmont") as a Delaware company and as the Manager of CBW Lending.  Coastal, in turn, is Coastal Belmont's Manager.  Coastal, CBW Lending and Coastal Belmont all share the same New York City address for their principal office.[137]

On February 15, 2010, Anglo executed a series of documents that transferred and assigned the senior loan documents and the assignment of leases and rents to CBW Lending.  In particular, on February 15, 2010, Anglo executed an allonge to the first promissory note directing payment of the loan to the order of CBW Lending, its successors and assigns.  CBW Lending thereby became the holder of the first promissory note.  In a separate transaction executed the same day, Anglo assigned the first mortgage and the assignment of leases and rents "[t]ogether with the [first promissory] Note" to CBW Lending, its successors and assigns ("the February 2010 assignment").[138]  (Docket Entry # 91, Ex. A(22)).

The February 2010 assignment thus transferred and sold the senior loan documents and the assignment of leases and rents to CBW Lending.  As set out in the February 2010 assignment, both Anglo and CBW Lending acknowledged and agreed that the first

---

[137]  SSR and SSRA also share a same address in East Boston.

[138]  Collectively, this court refers to the allonge and the February 2010 assignment as "the February 2010 transactions."

promissory note, the first mortgage and the assignment of leases and rents were "subject to the terms of" the ICA.  (Docket Entry # 91, Ex. A(22)).

By letter dated February 15, 2010, Anglo notified Noonan of the extension of the maturity date of the first promissory note to March 15, 2010.  By letter dated February 16, 2010, Anglo transmitted documents relative to CFJS' exercise of the Sarkis loan purchase option.  CFJS initially notified Anglo in a February 11, 2010 letter of CFJS' exercise, as assignee, of the Sarkis loan purchase option.  In a letter dated February 24, 2010, CFJS notified Anglo of CFJS' withdrawal of the election.

On March 1, 2010, Noonan's counsel wrote to Anglo requesting documents in accordance with section 11 of the ICA.  By letter dated March 2, 2010, Anglo informed Noonan that, "Following the withdrawal of [CFJS' notice to exercise the option], effective as of February 15, 2010, Anglo sold the Loan and assigned the Loan Documents, including the Mortgage and the Intercreditor and Subordination Agreement, to CBW Lending, LLC."  (Docket Entry # 91, Ex. A(33)).

B.  Discussion

Noonan moves for summary judgment on counts I, II, III, IV, V and X.  He attacks the February 2010 transactions and submits that, together with the August 2006 amendments and the October

2008 amendments and options, "defendants"[139] denied Noonan his right to consent under section 17 of the second mortgage, his right to purchase the senior loan documents under section 13 of the ICA, his right to capital event payments under the second promissory note[140] and his right to payment absent an event of default under section three of the ICA.  Noonan submits that SSR and CBW Lending, which Noonan refers to as the "Suffolk Downes Defendants," control the property.[141]  He also maintains that Anglo's February 2010 transfers to CBW Lending terminated the ICA, extinguished the first loan by virtue of a payoff to Anglo, materially increased the risk of nonpayment to Noonan and inter alia breached the covenant of good faith and fair dealing in "the Loan Documents."  (Docket Entry ## 94 & 123).

The Wonderland defendants, Anglo, CBW Lending and SSR raise a number of substantive arguments as well as a procedural one. With respect to the procedural argument, they uniformly contend that Noonan must amend the complaint to raise factual allegations and additional and/or expanded claims based on the February 2010

[139]  Noonan's reply memorandum identifies "defendants" as the Wonderland defendants, SSR, CBW Lending and Anglo.

[140]  Noonan argues that "Option Payments" are capital event payments mandatorily due Noonan under the second promissory note. Notably, Noonan has not received mandatory prepayments under the capital event covenant that would trigger section four of the ICA.

[141]  At present, CBW Lending, an intervenor, is not a named defendant.

126

transactions.

Noonan submits that seeking leave to amend is not required because he relies on the same claims asserted in the complaint now rendered more egregious by the February 2010 transactions. He also points out, correctly, that he is not raising the theories based on the February 2010 transactions in defense to a motion for summary judgment but, rather, in support of summary judgment.

The First Circuit recognizes that, "[W]hen a plaintiff raises a claim for the first time in response to a summary judgment motion, it is possible to treat the claim as a motion to amend the complaint under Rule 15(a) of the Federal Rules of Civil Procedure."  Kunelius v. Town of Stow, 588 F.3d 1, 19 (1st Cir. 2009) (dicta).  The present circumstances do not involve a plaintiff raising a new claim in an attempt to forestall summary judgment.  They involve a summary judgment motion filed by a plaintiff raising factual allegations based on recent agreements and transactions that took place after the December 2008 filing of the complaint.  Even under a broad reading of the complaint, it does not encompass these post complaint transactions.  See, e.g., Diomed, Inc. v. Vascular Solutions, Inc., 417 F.Supp.2d 137, 141 (D.Mass. 2006) (agreement "mentioned nowhere in the complaint" and "raised for the first time in Diomed's opposition to defendants' summary judgment motion" was not within "a broad

127

reading of the complaint").

Rule 15(d), Fed. R. Civ. P. ("Rule 15(d)"), as opposed to Rule 15(a), sets out the requirements for supplementing a complaint to set "out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." Fed. R. Civ. P. 15(d).  In pertinent part, Rule 15(d) provides that, "On motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented."  Fed. R. Civ. P. 15(d). Although unlike Rule 15(a), Rule 15(d) does not instruct a court to "freely give leave" to amend, Rule 15(a)(2), Fed. R. Civ. P., the "practice is to liberally allow supplemental pleadings." <u>The Hertz Corp. v. Enterprise Rent-A-Car Co.</u>, 557 F.Supp.2d 185, 192 (D.Mass. 2008); <u>see</u> <u>Mueller Co. v. U.S. Pipe & Foundry Co.</u>, 351 F.Supp.2d 1, 2 (D.N.H. 2005) (courts "generally assess motions to supplement pleadings under the same standard applicable to motions to amend").

In lieu of seeking leave to supplement the complaint with a motion for leave and attaching a proposed supplemental complaint with the new factual allegations based on the February 2010 transactions, Noonan contends that leave is not required in a reply memorandum to opposition memoranda to Noonan's summary judgment motion.  Assuming this court has the discretion to allow

128

supplementation without requiring a motion to amend, the present circumstances do not warrant exercising that discretionary authority.  A proposed supplemental complaint will assist this court in determining the parties to each count in the event Noonan wishes to add CBW Lending as a defendant to any count.  It will also assist this court and provide fair notice to defendants of the parameters of each count and which agreements are at issue with respect to the multiple breach of contract counts in the complaint.  In the event Noonan seeks additional declaratory relief, such as a declaration that the February 15, 2010 transfers are invalid, a proposed supplemental complaint will accurately set out the declarations sought.

If necessary, this court will expedite the time to respond to a motion for leave to supplement and conduct a hearing on the motion in an expedited fashion.  Noonan is not foreclosed from raising any of the substantive arguments in the second summary judgment motion in a future and timely dispositive motion.


## CONCLUSION

For the above reasons, the motion to dismiss Count XI (Docket Entry # 63) is **ALLOWED** to the extent that Count XI is **DISMISSED**.  The issue of an award of costs, if any, is deferred until after trial and the request for a separate final judgment is **DENIED**.

129

The motion to dismiss filed by Anglo (Docket Entry # 55) is **DENIED** except to the extent that Anglo is entitled to a dismissal of that part of Count IV dependent upon exhibit ten as a notice of default required under the ICA (Docket Entry # 1, ¶ 69) and any breach of the loan to value covenant encompassed in counts IV and V.[142]   The motions for summary judgment (Docket Entry ## 25 & 35) are **DENIED.**   Noonan's second summary judgment motion (Docket Entry # 96) is **DENIED** without prejudice.   Noonan may file a motion for leave to file a supplemental complaint and attach a proposed supplemental complaint to any such motion.

The parties shall appear for a status conference on August 2, 2010, at 2:30 p.m. to discuss inter alia the pending preliminary injunction motion in light of this opinion and the discovery schedule.

  /s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge

---

[142]   As previously explained, these counts remain in this action due to other breaches.

130